The UNITED STATES

v.

Robert Michael WILSON, a/k/a Peter Wilson, et al.

Crim. No. 72-0341.

United States District Court, D. Maryland.

July 6, 1973.

———◆———

Joseph Kiel, Baltimore, Md., for plaintiff.

Kirk Y. Griffin, Boston, Mass., Harold I. Glaser, Robert G. Carr, Frank B. Cahn, II, Baltimore, Md., for defendants.

MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

Under indictment for conspiracy to transport, sell, receive and dispose of goods in interstate commerce—18 U.S.C. §§ 371, 2314, 2315 (1970)—John Calise voluntarily submitted to a privately administered polygraph examination and moved for an order permitting the testimony of polygraph experts. The Court

heard testimony on two days relating to the threshold issue of whether the state of the art is sufficiently advanced to hold such evidence admissible. Thereafter, defendant Robert M. Wilson moved orally for permission to take a polygraph examination at government expense. The matter having been held sub curia, counsel has since informed the Court of the death of defendant Calise, leaving open only the motion of defendant Wilson.

■ Whether the state of the art of polygraphy is sufficiently advanced translates legally to a consideration of relevance, prejudice and to a lesser degree, burden on judicial time. See Proposed Rules of Evidence of United States District and Magistrates Courts, Rule 401, 403 (1972). Otherwise stated, expert evidence which assists the trier of fact will be admitted. *Ibid.* Rule 702. Such evidence is not objectionable solely because it embraces an ultimate issue. *Ibid.* Rule 704.

■ Since polygraphy comprehends physiological and psychological theory, the evaluation of the state of the art must necessarily broaden to include any research on the theoretical aspects of the technique. Equally valuable is the knowledge and research of experienced practitioners in polygraphy, regardless of a lack of training in the underlying conceptual disciplines. Thus, rather than putting the issue in terms of "general acceptance within a particular field" and engaging in an academic *dispute* as to the particular field in which polygraphy fits, the Court chooses to assess the progress of polygraphy by drawing on contributions from those engaged both in theory and practice. See Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923), Medley v. United States, 81 U.S.App.D.C. 85, 155 F.2d 857 (1946), Huntingdon v. Crowley, 64 Cal. 2d 647, 51 Cal.Rptr. 254, 414 P.2d 382 (1966), United States v. Stifel, 433 F.2d 431 (6th Cir. 1970), Coppolino v. State, 223 So.2d 68 (Fla.App.1969), United States v. Raymond, 337 F.Supp. 641 (D. D.C.1972).

It is undisputed that the technique of polygraphy has progressed dramatically since the ruling of inadmissibility in *Frye, supra.* The voluminous record reflects the improvements in the machines, the gains in knowledge, and the widespread use by the law enforcement and business communities. These advances have prompted qualified admissions in United States v. Ridling, 350 F.Supp. 90 (E.D.Mich.1972) and United States v. Dioguardi, 350 F.Supp. 1177 (E.D.N.Y. 1972) and unqualified admissions in People v. Cutler, No. A176,965 (Cal.Super.1972), Walther v. O'Connell, 72 Misc.2d 316, 339 N.Y.S.2d 386 (1972), and United States v. Zeiger, 350 F.Supp. 685 (D.D.C.1972), reversed per curiam under a local rule permitting interlocutory appeal, No. 72–2065 (D.C.Cir.1972). In United States v. DeBetham, 470 F.2d 1367, the Ninth Circuit affirmed per curiam, the decision of the district judge to deny admissibility based on earlier decisions in that circuit. The Court in United States v. Urquidez, 356 F.Supp. 1363 (C.D.Cal. April 13, 1973) similarly refused to depart from precedent.

This Court is not aware of any decision in the Supreme Court, the Court of Appeals for the Fourth Circuit, or the United States District Court for the District of Maryland which decides the question. Appropriately, the parties have elicited testimony and supplied transcripts of testimony of the leading experts in the world. The record includes transcripts of the trials in *Dioguardi, Zeiger* and *DeBetham, supra,* People v. Lazaros, CR–6237 (Mich.Cir. 1970), and United States v. Captain Ernest Medina (unreported court-martial Aug. 19, 1971). In addition, it contains excerpts from Reid and Inbau, Truth and Deception (1966), the amicus appellate brief of the California Association of Polygraph Examiners in *DeBetham*; Joseph F. Kubis, Studies in Lie Detection, Forham University, 1972; and the "Moss Committee" report, "Use of Polygraphs as 'Lie Detectors' by the Federal Government," H.Rep. 198, 89th Congress, 1st Session (Tenth Report by the Com-

mittee on Gov't. Operations, March 22, 1965).

Since the material, although representing divergent points of view, is often redundant, the sensible approach is to analyze the propositions advanced in favor of and opposed to admissibility.

The reported opinions need not be burdened with another detailed description of the mechanics involved. It is sufficient to note that the polygraph in issue includes cardiosphigmographic, pneumographic and galvanic components. The theory is that conscious deception causes an acute reaction in the sympathetic nervous system, translated chemically into higher rates of pulse, blood pressure, breathing and skin resistance. The machine is designed to record simultaneously the pattern of response to relevant and irrelevant questions. In addition, the examiner includes "control" questions, to which deception is anticipated, to determine reactability. A fair statement is that while studies conducted by private and governmental organizations assess the validity and reliability of the technique at 70% to 95%, the systematic research relating to the validity of polygraphy is still in its formative period and is ongoing.

A study of the theory and process of the polygraphy examination reveals complexities not present in the fields of fingerprint, handwriting, voiceprint, ballistics and neutron activation analysis, all of which are based on the identity or behavior of physical phenomena. The experts and studies differ as to the capability of the polygraph industry to cope with these complexities, but none would dispute their existence. The distinction is that polygraphy, albeit based on a scientific theory, remains an art with *unusual responsibility* placed on the examiner. The acquainting of the examiner with the subject matter is often a source of improper suggestion, conscious or subconscious. The preparation of the test and discussion with the examinee of the polygraph procedure furnishes additional opportunity for improper subjective evaluation.

The experts are in accord that the examiner must carefully watch for signs of psychosis, extreme neurosis, psychopathology, drunkenness and drugs, any of which might preclude a successful examination. While the "control" question is a built-in check on the subject's reactability, speculation survives that a portion of the population, sometimes called "pathological liars," can "beat" the machine. Since reactability is a matter of degree, it would appear that the danger of prejudice from subtle, undetected psychological conditions is not imaginary.

The construction of the examination further proliferates controversy. Experts disagree on the effectiveness of an examination which lacks a galvanic component. The formulation of test questions, the pacing, the interspersing of relevant with irrelevant and "control" questions, the making of mechanical adjustments, and the number of charts taken—all add to the responsibility of the examiner. It is noteworthy that the defendant Calise's own witnesses on the general question of validity and reliability of polygraphy testified for the government that the particular examination was inconclusive, and for different reasons. Sgt. Travers testified that the construction of the examination itself was at fault. While difference of opinion is not unknown to numerous fields of scientific endeavor, the divergent reactions of the leading practitioners hardly inspires confidence in the reliability of the opinions of less distinguished practitioners.

The subjective nature of the examination extends to the test itself. The failure of a subject to react to a relevant question may be attributable to a yoga-like abstraction of the mind or perhaps even unusually low blood pressure, coupled with control of breathing. Alternatively, the subject may attempt to react artificially to irrelevant questions by hidden muscle contractions or self-infliction of pain, and by artificial conjuring

of exciting images. At the opposite end of the spectrum, a reaction to a relevant question may be imputable to external physical stimuli or subtle psychological stress factors not necessarily associated with deception.

The proponents of polygraphy stress that a good examiner will exclude subjective factors, carefully note external stimuli, and seek out possible psychological characteristics which impair the effectiveness of the examination. For example, it is the duty of the examiner to ask the examinee to explain his *reactions* to relevant questions. The Court does not gainsay the usefulness of examinations conducted by leading experts in an investigative setting. But even the *experts* admit to varying degrees of error, compounded when one considers the proficiency of less qualified examiners.

The subtleties of physiological and psychological reaction also result in divergence in interpretation of the polygraph charts and the consistency of reaction necessary to reach a definite conclusion. Again, it is illustrative that the defense witnesses, Mr. Brisentine and Sgt. Travers, challenged the conclusiveness of the particular charts in question. The absence of national standards for the education of polygraph examiners causes still more concern. Even among the schools considered to have adequate programs, the curriculum and admissions standards vary substantially. Despite the efforts of the American Polygraph Association, it is admitted that there exist numerous incompetent examiners. A majority of states have enacted licensing programs; Maryland has no such program. Thus, the admissibility of polygraph examination results would open a pandora's box.

The proponents of admissibility suggest that a jury can properly assess the competence and merit of the testimony of an examiner subjected to cross-examination. This contention is of dubious validity, as a rule. The cross-examination of an expert poses a formidable task; it is the rare attorney who knows as much as the expert. Given the numerous subtleties of interpretation inherent in modern polygraphy and the mysteriousness of the technique to the citizen, the danger of confusion of the jury is great. The jury may be misled, and may give undue weight to the testimony.

The danger level rises geometrically because of the disproportionate influence the polygraph examination evidence inevitably will exercise, both because germane to credibility on the ultimate finding and because of the consumption of time necessarily involved in examination, cross examination and battle of experts. The specter of "trial by polygraph" replacing trial by jury is more than a felicitous slogan. The prospect of the admission of polygraph examinations taken by a non-party witness accentuates this troublesome proposition.

It is argued that eyewitness testimony is fallible, yet admitted. But eyewitness testimony is virtually indispensable. In addition, the jury of twelve men is designed to evaluate such testimony based on common sense and ordinary experience. This historic function should not be lightly exposed to drastic revision. Evaluation of the testimony of polygraph experts is indeed beyond the realm of ordinary experience.

It is argued in addition that polygraphy is as reliable as fingerprinting, handwriting, ballistics, neutron activation analysis, medical analysis (bloodtesting, toxicology), and other forms of scientific evidence which courts have admitted. Like polygraphy, the physical sciences often rely on nonphysical intellectual models. For example, the theory which underlies neutron activation analysis and bloodtesting involves *conceptual* models which explain and predict observable phenomena. But like fingerprints and handwriting, *these processes are much more susceptible to controlled experimental verification.* The Court may take judicial notice that the physical sciences exceed the social sciencies, including

clinical psychology, in terms of experimental quantification and verifiability. Indeed, the uniqueness of the human psyche still provokes debate as to whether the study of human behavior can approach scientific standards as understood in the physical disciplines. The fundamentally psychological component of the examination, the subjectivity of interpretation, and the incipient stage of experimental research, preclude the finding of a *particular* degree of probability of accuracy of a polygraph examination. Thus, it is impossible at this time to assess the substantiality of the degree of error in the polygraph process. This is not to deny absolutely the probative value of the technique, but to underline the analytical difficulties which remain unsolved.

It is finally argued that psychiatric testimony is admissible on important issues, such as the criminal defense of insanity. Judicial experience with psychiatric testimony has been less than satisfactory, reflected in the various attempts to reformulate the insanity defense and reform laws relating to civil commitment. See Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), D.C.Code § 21–521 et seq. (1967 and Supp. V., 1972). Granting however, that such testimony is admissible, it is *indispensable* to the resolution of the particular legal issues. Such is not the case with polygraphy. It is also noteworthy that the educational prerequisites for a degree in psychiatry are uniformly higher than for completion of training in polygraphy.

If the foregoing raises severe doubts in the minds of those liberally disposed to admit expert evidence, those doubts are hardly allayed by the reminder that only those defendants who successfully take examinations will move their admission in court. Furthermore, the defendant with means is in a position to take an examination in confidence with the knowledge that if he fails, he need not disclose; perhaps he may succeed on the next try. This sense of security diminishes the fear of discovered deception, upon which an effective examination depends. While this latter possibility nears the borderline of legal ethics, it cannot be discounted. A defendant might take an examination, for example, without the knowledge of his attorney.

Equally troublesome is the discrimination against the indigent defendant who cannot take an examination without the government's financing and knowledge. The comparison of Calise and Wilson here is illustrative.

█ A review of the problematic implications of admissibility of polygraph examination evidence, intrinsic and extrinsic to the technique itself, leads this Court to the conclusion that, even assuming relevance, the degree of which is speculative, the substantial prejudicial consequences compel denial of the motion.