**UNITED STATES of America,
Appellee,**

v.

**Steven John ALEXANDER, Appellant.**

**No. 75–1424.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 9, 1975.

Decided Nov. 18, 1975.

162

Michael K. Steenson, St. Paul, Minn., for appellant.

Mel I. Dickstein, Asst. U. S. Atty., Minneapolis, Minn., for appellee.

Before GIBSON, Chief Judge, HEN-LEY, Circuit Judge, and VAN PELT, Senior District Judge.*

GIBSON, Chief Judge.

Defendant, Steven Alexander, was convicted in a non-jury trial of violating 18 U.S.C. App. § 1202(a)(1) (1970) which proscribes possession of a firearm affecting interstate commerce by a convicted felon. He received a two year sentence. The sole issue on this appeal is whether the District Court erred in refusing to admit the results of an unstipulated polygraph examination offered by defendant.

On January 8, 1974, two police officers were directed to investigate a particular automobile in Rochester, Minnesota. As the officers approached the automobile, they observed defendant sleeping in the front seat. Defendant was ordered out of the vehicle and, in the process of raising himself up, the officers alleged that he attempted to conceal a .25 caliber semiautomatic pistol under the seat. After the officers confiscated the pistol, defendant was arrested on the charge of violating § 1202(a)(1) since the arresting officers were aware of his prior felony conviction. Neither the car nor the pistol was registered in defendant's name. At trial, defendant offered in evidence the results of an unstipulated polygraph examination which ostensibly bolstered his contention that he was not in possession of the weapon at the time of his arrest. We thus are afforded a classic confrontation between the accused and a police officer as to a factual occurrence participated in by the accused and witnessed by the officer. After granting the parties time to prepare and submit memoranda in support of their respec-

* The Honorable Robert Van Pelt, United States Senior District Judge for the District of Nebraska, sitting by designation.

tive positions concerning the admission of the polygraph evidence, the District Court[1] refused to admit the evidence. Defendant filed a timely appeal.

The polygraph technique is based on the premise that an individual's conscious attempt to deceive engenders various involuntary physiological changes due to an acute reaction in the sympathetic parts of the autonomic nervous system. The polygraph machine is an electromechanical instrument which measures and records these physiological fluctuations that are detected with the aid of three basic components: (1) the pneumograph which monitors the respiration rate of the examinee; (2) the cardiosphygmograph which gauges blood pressure and pulse rate; and (3) the galvanometer which measures the galvanic skin reflex or electrodermal response—skin resistance to electrical current (perspiration on the palmar surfaces of the hands will increase the flow of electrical current). Some of the more recent polygraph machines have incorporated a device that detects unobservable muscular activity believed to accompany intentional attempts to control the other responses that are recorded by the polygraph.[2] All of the physiological responses detected by these components are transmitted by a recording pen onto a constantly moving piece of graph paper, a polygram. The function of polygraph practitioners, or polygraphists, is to study and interpret the markings on the polygram and make a determination as to whether the recorded physiological reactions evince the psychological and emotional pressures which normally accompany intentional attempts to deceive. It is clear, therefore that the polygraph does not detect lies, but merely records physiological phenomena which are assumed to be related to conscious deception.

Courts have generally admitted all scientific evidence that may serve as a forensic aid to the judicial process. However, as a predicate to the admission of expert testimony pertaining to such evidence, the scientific principle "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States,* 54 U.S.App.D.C. 46, 293 F. 1013, 1014 (1923).[3] The reliability of a scientific technique is one of the most important factors that courts should consider in determining whether that technique is generally accepted in the scientific community. *United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975). It is the judge's responsibility to initially assess whether there is a sufficient degree of general scientific acceptability to warrant admission of the evidence. *United States v. Stifel,* 433

---

1. The Honorable Irving Ben Cooper, United States Senior District Judge for the Southern District of New York, sitting by designation. The trial judge was unimpressed with defendant's version of the facts. In finding the defendant guilty, the judge said:

   I have no reasonable doubt. I reject the defendant's testimony in total. It was unimpressive, it was unconvincing, it was hollow, it was devoid of truth. On the other hand, I find that Officer Miller's testimony was solid and based on actual physical observation of what went on. It was impressive, it was convincing. It carried with it a solid impression of truthfulness and fair play.

2. J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique* 3 (1966) [hereinafter referred to as Reid & Inbau].

3. The implementation of this standard for the admissibility of scientific evidence has been criticized. C. McCormick, *Law of Evidence* § 203, at 491 (2d ed. 1972). However, federal courts of appeals continue to subscribe to this "general scientific acceptability" criterion. *United States v. Addison,* 162 U.S.App.D.C. 199, 498 F.2d 741, 743 (1974) (spectrographic analysis); *United States v. Stifel,* 433 F.2d 431, 438 (6th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971) (neutron activation analysis); *Marks v. United States,* 260 F.2d 377, 382 (10th Cir. 1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959) (polygraphic evidence). This test does not compel a showing of infallibility, but does require the submission of probative evidence indicating general acceptance in the relevant scientific community of the theory underlying such technique, as well as sufficient assurance of accuracy and reliability.

F.2d 431, 438 (6th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971). Once a judge concludes that expert testimony is to be permitted, the jury is entitled to review the evidence and accord it such weight as the jury feels is warranted. *Feguer v. United States,* 302 F.2d 214, 242 (8th Cir.), *cert. denied,* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962).

■ In applying the scientific acceptability standard to polygraph tests, all United States courts of appeals addressing the issue have excluded the results of unstipulated polygraph tests. These courts reason that the polygraph does not command scientific acceptability and that it is not generally believed to be sufficiently reliable in ascertaining truth and deception to justify its utilization in the trial process. Consequently, they have held that the results of an unstipulated polygraph examination are either *per se* inadmissible [4] or that the trial court did not abuse its discretion in refusing admission of the test results.[5] Most of these cases manifest rather laconic discussions of why polygraph results should be inadmissible and their stated authority for exclusion is generally *Frye v. United States, supra,* and its progeny. *Frye* held that the Marston "systolic blood pressure deception" test lacked scientific acceptability and thus its results were inadmissible. However, the polygraph used in *Frye* measured only variations in the examinee's blood pressure and was a relatively unsophisticated precursor to the modern polygraph machine which measures many other physiological responses. The key issue on this appeal is whether the modern polygraph machine and technique have attained sufficient scientific acceptance among experts in polygraphy, psychiatry, physiology, psychophysiology, neurophysiology and other related disciplines to justify the admission of the results of an unstipulated polygraph examination in evidence.[6]

In 1964, the Committee on Government Operations of the House of Representatives conducted several days of hearings on the use of polygraphs by the federal government.[7] During the course

---

**4.** *E. g., United States v. Cochran,* 499 F.2d 380, 393 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975); *United States v. Skeens,* 161 U.S.App.D.C. 131, 494 F.2d 1050, 1053 (1974); *United States v. Sockel,* 478 F.2d 1134, 1136 (8th Cir. 1973); *Marks v. United States,* 260 F.2d 377, 382 (10th Cir. 1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959); *United States v. Bando,* 244 F.2d 833, 841 (2d Cir.), *cert. denied,* 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957) (dicta).

**5.** *E. g., United States v. Mayes,* 512 F.2d 637, 648 n. 6 (6th Cir. 1975); *United States v. Watts,* 502 F.2d 726, 728 (9th Cir. 1974); *United States v. Chastain,* 435 F.2d 686, 687 (7th Cir. 1970).

**6.** Some commentators have posited the argument that the polygraph need only attain general acceptance among the polygraph operators themselves to satisfy the test for admissibility. Reid & Inbau, *supra* note 2, at 238; O'Connor, "That's the Man": A Sobering Study of Eyewitness Identification and the Polygraph, 49 St. John's L.Rev. 1, 19 (1974). This position must be rejected. The polygraph technique is premised upon a complicated interrelationship of psychological stress, a concomitant effect upon the autonomic nervous system and a resultant physiological response. There must be some assurances and explanations, in assessing the polygraph, that these stimuli and responses are precipitated by attempts to deceive and that no other cogent explanation exists for these interassociated reactions. Experts in neurology, psychiatry and physiology may offer needed enlightenment upon the basic premises of polygraphy. Polygraphists often lack extensive training in these specialized sciences. According to one commentator:

> [T]here are very few examiners who are both experienced and responsible. Although there are 300–400 persons who regularly give polygraph tests and examinations, leading professionals have admitted that not more than 10% are truly competent. These professionals also acknowledge that it is relatively simple for incompetent or dishonest "experts" to render inaccurate or perjured testimony for the party by whom they are employed. (Footnotes omitted.)

Highleyman, The Deceptive Certainty of the "Lie-Detector", 10 Hastings L.J. 47, 57–58 (1958).

**7.** Hearings on the Use of Polygraphs as "Lie Detectors" by the Federal Government Before the House Comm. on Government Operations, 88th Cong., 2d Sess. (1964).

of the hearings, the Committee heard testimony from preeminent polygraphists, psychiatrists, psychologists, psychophysiologists and other witnesses who were able to attest to the operation and accuracy of polygraphs. In its report, the Committee concluded:

> There is no "lie detector." The polygraph machine is not a "lie detector", nor does the operator who interprets the graphs detect "lies." The machine records physical responses which may or may not be connected with an emotional reaction—and that reaction may or may not be related to guilt or innocence. Many, many physical and psychological factors make it possible for an individual to "beat" the polygraph without detection by the machine or its operator.[8]

The rationale forwarded by the Committee, as well as by the courts which have discussed the reasons for excluding polygraph evidence, is that there are too many uncontrollable or unascertainable factors which may affect the polygraphist's conclusion as to the veracity or falsity of the examinee's responses. Among the numerous constituents which may individually or collectively operate to result in an inaccurate reading are: (1) the physiological abnormalities of the examinee, which may include high or low blood pressure, respiratory disorders and heart diseases, as well as a state of discomfort or extreme fatigue during the examination; (2) extreme nervousness or emotional tension by an innocent person who may believe that the polygraph will produce an inaccurate and inculpatory result; (3) anger or resentment toward the examiner or the questions asked; (4) inadequate or misleading phrasing of the questions by the examiner; and (5) a mental abnormality of the examinee, which may include psychosis, psychoneurosis or a psychopathic personality.[9]

The existence of any of these factors creates either physiological responses or unresponsiveness in the examinee which is unrelated to the truthfulness or falsity of his or her response to a question. Nevertheless the examinee's reactions are transmitted to the polygram and interpreted by the polygraphist. If the existence of these many variables is not detected and controlled, inaccurate or inconclusive results may be reached. The degree of error in polygraph results caused by these and other factors is subject to debate. John Reid, a leading authority on polygraphs, has estimated a nine percent rate of error under optimal testing conditions where the polygraph examination is conducted by competent, experienced polygraphists.[10] Other commentators have estimated a degree of error of 25 percent or more.[11] An accurate ascertainment of error is rendered difficult since the results obtained in a controlled experiment may vary significantly from the results of tests involving actual criminal suspects being tested under more traumatic circumstances. Furthermore, it is often difficult to supply supportive and objective evidence to verify a polygraphist's conclusion as to a

---

8. H.R.Rep.No.198, 89th Cong., 1st Sess. 13 (1965). The House Committee on Government Operations took a strong stand against the reliability of polygraphs in concluding, "There is no 'lie detector,' neither machine nor human. People have been deceived by a myth that a metal box in the hands of an investigator can detect truth or falsehood." *Id.* at 1.

9. For further discussion of these and other factors, as well as the varying extent to which they affect test results, see *United States v. Urquidez,* 356 F.Supp. 1363 (C.D.Cal.1973); H.R.Rep.No.198, 89th Cong., 1st Sess. 12–13 (1965); Reid & Inbau, *supra* note 2, at 168–207.

10. *United States v. Zeiger,* 350 F.Supp. 685, 689 (D.D.C.), *rev'd,* 155 U.S.App.D.C. 11, 475 F.2d 1280 (1972).

11. Burkey, *The Case Against the Polygraph,* 51 A.B.A.J. 855, 856 (1965); Highleyman, The Deceptive Certainty of the "Lie Detector", 10 Hastings L.J. 47, 62 (1958). For a critical analysis of the polygraph, as well as the deceptive aspects of the accuracy figures, see Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694 (1961).

subject's veracity since there is no assured way in most cases to determine whether the subject was actually being truthful or deceitful.

Further complicating the problem of reliability that can be affected by extraneous stimuli not connected with guilt is the apparent fact that the polygraph will not operate reliably on a class of persons who for one reason or another is emotionally unresponsive. According to Highleyman:

> An examiner cannot detect deception if the subject is unresponsive in character or nature, or if the subject has no fear of detection because of a fatalistic attitude, rationalization of his behavior, "circumscribed amnesia," or a condition of shock or exhaustion. In addition, the polygraph cannot be used successfully on pathological liars, children, the mentally dull, or other subjects who are unable to distinguish between truth and falsehood. (Footnotes omitted.)

Highleyman, The Deceptive Certainty of the "Lie Detector", 10 Hastings L.J. 47, 58–59 (1958).

■ After careful review of the numerous materials presently available discussing polygraphy, we conclude that the results of unstipulated polygraph examinations should not be admissible in evidence at a criminal trial. While the polygraphic science and its instruments have advanced significantly since the *Frye* case, we are still unable to conclude that there is sufficient scientific acceptability and reliability to warrant the admission of the results of such tests in evidence. There is an insufficient degree of assurance that polygraph machines and operators are capable of discovering and controlling the many subtle abnormalities and factors which affect test results. This conclusion is certainly not intended to foreclose the admissibility of unstipulated polygraph evidence in the future if objective and probative evidence is proffered indicating greater acceptability in the relevant scientific community.

Defendant contends that there is a perceptible trend toward admissibility of polygraph evidence and that this court should take cognizance of it and admit unstipulated polygraph test results. It is true that a limited number of federal district courts have sanctioned the admission of such evidence in certain situations and under limited circumstances.[12] However, the disposition of these particular cases on appeal would dispel any conception of a "trend" toward unqualified admissibility in federal courts at the present time. One district court decision allowing the admission of polygraph results conceded that the polygraph's "limitations * * * and the intricacies which affect its performance may not be understood to the complete satisfaction of the scientific community * * *." *United States v. Zeiger,* 350 F.Supp. 685, 688 (D.D.C.1972). That decision was reversed summarily on appeal. *United States v. Zeiger,* 155 U.S.App.D.C. 11, 475 F.2d 1280 (1972). An extensive opinion in *United States v. DeBetham,* 348 F.Supp. 1377 (S.D.Cal.1972), articulated various reasons as to why unstipulated polygraph evidence should be admissible, but excluded such evidence on the basis of substantial precedential authority in the Ninth Circuit. This exclusion was affirmed on appeal. *United States v. DeBetham,* 470 F.2d 1367 (9th Cir. 1972), *cert. denied,* 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973). Only *United States v. Ridling,* 350 F.Supp. 90 (E.D. Mich.1972), which conditionally allowed

---

**12.** Two recent state court decisions approved the admission of the results of unstipulated polygraph examinations pursuant to rather stringent standards. *Commonwealth v. Juvenile (No. 1),* 313 N.E.2d 120 (Mass.1974) (4–3 decision); *State v. Dorsey,* 88 N.M. 184, 539 P.2d 204 (1975). However, other state courts have recently adhered to the traditional rule disallowing admission of polygraph evidence absent stipulation depite the contrary decisions in a few federal district courts and state courts. *State v. Seebold,* 111 Ariz. 423, 531 P.2d 1130 (1975); *People v. Levelston,* 54 Mich.App. 477, 221 N.W.2d 235 (1974); *Harrison v. State,* 307 So.2d 557 (Miss.1975); *State v. Jackson,* 287 N.C. 470, 215 S.E.2d 123 (1975); *State v. Woo,* 84 Wash.2d 472, 527 P.2d 271 (1974).

the admission of polygraph tests under rigid conditions [13] and limited circumstances, has not been reversed or reviewed on appeal. However, *Ridling* involved a perjury offense. The court stressed that this type of case is ideal for the acceptance of polygraph evidence since the polygraph can be particularly useful in detecting whether a person acted "willfully" or "knowingly." *United States v. Ridling, supra* at 93, 98. Despite the rationale and holding of *Ridling,* one court of appeals has expressed the view that it is unpersuaded by that case. *United States v. Frogge,* 476 F.2d 969, 970 (5th Cir.), *cert. denied,* 414 U.S. 849, 94 S.Ct. 138, 38 L.Ed.2d 97 (1973). Subsequent to *Ridling,* the district court judges in *United States v. Wilson,* 361 F.Supp. 510 (D.Md.1973), and *United States v. Urquidez,* 356 F.Supp. 1363 (C.D.Cal.1973), conducted their own extensive and independent study of the polygraph and concluded that the results of polygraph tests should be inadmissible despite *Ridling.* We agree with the latter cases and we refuse, at the present time, to adopt the rational of *Ridling* to the extent that it may permit the admission of unstipulated polygraph results.

The concept of psychological testing or the more glamorous designation of "lie detector" has an instant appeal to all persons and agencies engaged in ferreting out the truth. As Dean Wigmore over 50 years ago noted, "If there is ever devised a psychological test for the valuation of witnesses, the law will run to meet it." J. Wigmore, *Evidence* § 875 (2d ed. 1923). If we were satisfied in our own minds about the scientific reliability of polygraph tests and the integrity and responsibility of the examiners to the extent of an almost unimpeachable result, we would eagerly acknowledge the reliability of the machine and embrace its use in court proceedings in the absence of stipulation by the parties. However, as noted in the many

studies and the reported cases dealing with its admissibility and nonadmissibility, it is apparent that a polygraph examination embraces a number of complexities not present in the areas of fingerprint, handwriting, voiceprint, ballistics and neutron activation analysis. These deal primarily with physical phenomena rather than psychological responses. As noted in *United States v. Wilson, supra* at 512:

> The distinction is that polygraphy, albeit based on a scientific theory, remains an art with *unusual responsibility* placed on the examiner. The acquainting of the examiner with the subject matter is often a source of improper suggestion, conscious or subconscious. The preparation of the test and discussion with the examinee of the polygraph procedure furnishes additional opportunity for improper subjective evaluation.

Apparently that segment of the population referred to as "pathological liars" can beat the machine, thus opening the flood gates for a miscarriage of justice in those instances. Moreover, its admission leads to other problems including potential conflicts with constitutional guarantees. A defendant would not have to take the test and usually only a defendant who thought he could attain a satisfactory result would agree to take the test. The test also could be taken by him privately a number of times so that he might be able to so condition his reflexes as to beat the machine. Of course, this is not to say that the psychological testing is not of considerable probative benefit in many fields of testing. It well may be that with further advances in the art of polygraphy, testing under controlled conditions will be recognized as a standard and useful tool in discerning the truth.

Aside from doubts about the reliability of polygraphy at this stage of the art, there are some countervailing policy con-

---

**13.** One of the conditions was that the court appoint the expert to conduct the examination from a panel of three supplied by the parties and that the court-appointed expert must be able to express an opinion that the defendant was or was not telling the truth on the chief issue in the case.

siderations which militate against the admissibility of unstipulated polygraph evidence at trial. A foremost concern is the effect that such evidence will have on juries provided that the polygraph attains the degree of scientific acceptability and reliability which will allow its admission in evidence. The proponents of the polygraph refuse to acknowledge any exaggerated effect on the jury and contend that the examination results will be presented for the jury's consideration and that it may disregard those results if it desires. *United States v. Ridling, supra* at 98. However, their reasons for attempting to discount the effect of polygraph evidence on jurors are unpersuasive upon considering the circumstances surrounding its admission at trial, as well as the nature and scope of polygraph evidence.

■ When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the evidentiary foundation at trial, the polygraphist will present his own assessment of the test's reliability which will generally be well in excess of 90 percent. He will also present physical evidence, in the form of the polygram, to enable him to advert the jury's attention to various recorded physiological responses which tend to support his conclusion. Based upon the presentment of this particular form of scientific evidence, present-day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful

in his response to a question bearing on a dispositive issue in a criminal case.[14] To the extent that the polygraph results are accepted as unimpeacheable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted.

The jury institution was created and maintained due to the public reluctance "to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968). However, in many cases where polygraph evidence is admitted, a single person, the polygraphist, will give testimony which will often be the determinative factor as to the guilt or innocence of a defendant in a jury-tried case. This would deprive the defendant of the common sense and collective judgment of his peers, derived after weighing facts and considering the credibility of witnesses, which has been the hallmark of the jury tradition.[15] The potentially pervasive influence of polygraph evidence upon the jury has not gone unnoticed in the judicial ranks. Judge Irving Kaufman, now Chief Judge for the United States Court of Appeals for the Second Circuit, expressed the following views as a district court judge:

The most important function served by a jury is in bringing its accumulated experience to bear upon witnesses testifying before it, in order to distinguish truth from falsity. Such a process is of enormous complexity, and involves an almost infinite number of variable factors. It is the basic premise of the jury system that twelve

**14.** It has been stated that a polygraphist gives an opinion only as to the truth or falsity of defendant's responses and does not testify as to the guilt or innocence of the defendant. *United States v. Zeiger, supra* at 691, *rev'd,* 155 U.S.App.D.C. 11, 475 F.2d 1280 (1972). This is an illusory distinction in most instances. If a properly phrased question or series of questions are asked which encompass all relevant elements of the crime and the polygraphist testifies that the defendant's exculpatory

responses were fabricated, the import of the testimony is clear. The implicit conclusion is that the defendant was a participant in the crime.

**15.** These concerns are obviously of no significance where the defendant has waived his right to trial by jury. *Patton v. United States,* 281 U.S. 276, 301, 50 S.Ct. 253, 74 L.Ed. 854 (1930).

men and women can harmonize those variables and decide, with the aid of examination and cross-examination, the truthfulness of a witness. But a [polygraph] machine cannot be examined or cross-examined; * * * I am not prepared to rule that the jury system is as yet outmoded. I still prefer the collective judgment of twelve men and women who have sat through many weeks of a trial and heard all the evidence on the guilt or innocence of a defendant.

*United States v. Stromberg,* 179 F.Supp. 278, 280 (S.D.N.Y.), *rev'd in part on other grounds,* 268 F.2d 256 (2d Cir. 1959); see *United States v. DeBetham,* 348 F.Supp. 1377, 1390–91 (S.D.Cal.), *aff'd,* 470 F.2d 1367 (9th Cir. 1972).

The courts must use due circumspection in all cases to assure that the defendant who elects to exercise his constitutional right to a jury trial may avail himself of the traditional benefits of the jury system and that opinion evidence based on psychological testing does not cause the jury to abdicate its historical functions.

It may be argued that all forms of scientific evidence may have a substantial effect upon jurors and may tend to invade the factfinding province of the jury; thus, polygraph evidence is not objectionable on this basis. However, polygraph evidence is distinguishable from other types of scientific evidence in that its scope is much broader. Scientific evidence based on ballistic analysis, fingerprint comparison, handwriting analysis, voiceprint or spectrographic analysis, and neutron activation analysis is elicited solely for the purpose of identifying either an individual or an object allegedly involved in the perpetration of a criminal act.[16] These scientific tests do not purport to indicate with any degree of conclusiveness that the defendant who is so identified or connected with the object actually committed the crime. The jury, after receiving such expert testimony, has the additional responsibility of reviewing other facts which tend to prove or disprove defendant's connection with the crime and, if participation is shown, the jury may further be required to ascertain the defendant's mental state at the time of the crime in appropriate cases.

The role of the jury after a polygraphist has testified that the results of a polygraph examination show that the defendant's denial of participation in the crime was fabricated is much more circumscribed. If the expert testimony is believed by the jury, a guilty verdict is usually mandated. The polygraphist's testimony often is not limited to mere identification or any other limited aspect of defendant's possible participation in the criminal act. Through the testimony of the polygraph expert relating to whether the defendant was being truthful in his responses concerning participation in the crime, the expert is thus proffering his opinion based on scientific evidence bearing upon the sole issue reserved for the jury—is the defendant innocent or guilty? Is this good or bad? We have ruled that an expert may give his opinion on the ultimate jury question. *Feguer v. United States,* 302 F.2d 214, 242 (8th Cir. 1962). The new rules of evidence also permit this. Fed.R.Ev. 704 (1975). The resolution of this dilemma can await another day.·

The extent to which the polygraph evidence may tend to pervade the factfinding process in a jury trial and the probable effect that such evidence may have upon jurors may be some of the reasons underlying judicial reluctance to admit the results of unstipulated polygraph tests. The need for caution and careful

---

**16.** These various types of scientific evidence have been stated to be further distinguishable from polygraph evidence since they "*are much more susceptible to controlled experimental verification.*" *United States v. Wilson, supra* at 513. Some have concluded that testimony bearing on the identification of individuals or their psychiatric condition should be admitted despite its disadvantages because it is indispensable to the trial process. In contrast, polygraph evidence is not necessary since the jury is capable of performing the function served by the polygraph. *United States v. Wilson, supra* at 514; *cf. United States v. Brown,* 149 U.S.App.D.C. 43, 461 F.2d 134, 145–46 n. 1 (1971) (Bazelon, C. J., dissenting).

reflection by the courts on this matter is particularly mandated when consideration is given to the many factors that may produce erroneous polygraph results and the likelihood that the polygraphist's mistaken conclusion as to a defendant's veracity will result in a miscarriage of justice.

Based upon the conclusion that the polygraph does not presently command general scientific acceptance and has not been shown to be sufficiently reliable,[17] the District Court did not err in refusing to admit the unstipulated polygraph evidence.

The judgment of conviction is affirmed.[18]

17. Should the polygraph become sufficiently refined to satisfy the "general scientific acceptability" test and should the practical and possible constitutional problems of its use be adequately resolved, it would be advisable for the trial judge to undertake an active role in directing and controlling the taking of the examination. This would avoid the introduction in evidence of inconsistent test results at trial which may be subject to varying interpretations, thus inducing a "battle of experts." Due to our disposition of this case, it is unnec-essary for us to enumerate the procedures that might be followed under these circumstances.

18. This decision does not conflict with this court's recent decision in *United States v. Oliver,* 525 F.2d 731 (8th Cir. 1975). *Oliver* held that when the parties stipulate to the admissibility of polygraph evidence, the trial court may exercise its discretion in either admitting or refusing to admit such evidence. In the present case, there was no such stipulation.