**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0608n.06

**No. 09-5677**

| | |
|---|---|
| **UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT** | **FILED**<br>**Sep 15, 2010**<br>LEONARD GREEN, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| ELLIS ROARK, | ) | District of Kentucky |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BOGGS and CLAY, Circuit Judges; and WISEMAN, District Judge.[*]

BOGGS, Circuit Judge. Ellis Roark appeals his 87-month sentence for possession of OxyContin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). This appeal presents two issues for our review. First, did the district court err in finding that there was sufficient evidence to show that Roark was responsible for three hundred tablets of OxyContin? Second, did the district court err in concluding that Roark's prior sentence for burglary was a "sentence of imprisonment" under USSG § 4A1.2(b)? For the following reasons, we affirm Roark's sentence.

I

In September 2008, a cooperating witness ("CW"), acting at the behest of police, placed a series of calls to Roark in an effort to orchestrate a controlled purchase of OxyContin. At the time

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

the calls were made, the CW had been using Roark as a source for "quite awhile" and had purchased fifty-four 80-mg OxyContin tablets as recently as July 2008. *Ibid.* In the first call, the CW tried to purchase six hundred tablets, a quantity Roark had offered in previous conversations. However, Roark explained that the six hundred tablets had already been sold, so no deal was struck. Roark then offered to sell two hundred forty tablets, but later backed off that number, stating that the pills were stuck in Ohio for the foreseeable future. *Ibid.* In the end, the CW and Roark agreed on a deal involving forty tablets and arranged to meet at a Marathon Gas Station off of Interstate 75 in Laurel County, Kentucky.

When Roark set out for the gas station, police were waiting. As he approached, they pulled him over and arrested him. They then patted him down and found two prescription bottles containing approximately fifty 80-mg OxyContin tablets. *Ibid.* According to the labeling, neither of the bottles was intended to hold OxyContin. *Ibid.* After being read his *Miranda* rights, Roark told officers that he had been obtaining OxyContin and methadone from a source in Michigan. With respect to quantity, he stated that he was receiving three hundred tablets of OxyContin at a time. *Ibid.* He did not, however, mention how much methadone he was receiving. Nor did he reveal the identity of his source.

On October 2, 2008, a federal grand jury sitting in the Eastern District of Kentucky returned a two-count indictment charging Roark with conspiracy and possession offenses related to the tablets found during the search. Several months later, Roark entered into a Rule 11 plea agreement with the government and eventually pled guilty to a single count of possession, with intent to distribute, of the OxyContin pills, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

Prior to sentencing, the probation office compiled a presentence report ("PSR") pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A). The PSR recommended an advisory Guidelines range of 84 to 105 months, based on a total offense level of 23 and a Criminal History Category of V. Roark objected to these calculations, arguing that the PSR held him accountable for too much OxyContin, specifically, six hundred 40-mg tablets. To prove that he had never possessed that many pills, Roark hired a former FBI agent to perform a number of polygraph examinations. During the examinations, Roark was asked several narrow questions about the amount of OxyContin he had obtained. For example, he was asked whether he had ever possessed six hundred OxyContin at one time. According to the FBI agent, Roark answered the questions truthfully. In light of the results, Roark argued that "the only reliable evidence for a pill count [was] the pills actually recovered from him at the time of his arrest."

Roark also objected to the PSR's calculation of his criminal history score. More precisely, he argued that the PSR improperly concluded that one of his prior sentences—a state-court sentence for burglary—was a "sentence of imprisonment" for purposes of USSG § 4A1.2(b), leading to the addition of too many criminal history points. He argued that the prior sentence was actually a sentence of probation or a suspended sentence. He also noted that, without the additional points, his Criminal History Category would be IV, as opposed to V.

Roark was sentenced on May 21, 2009. At the hearing, the district court granted Roark's objection to the total offense level, concluding that three hundred 40-mg OxyContin pills was a safer estimate than the six hundred suggested in the PSR. However, the district court denied Roark's objection to his Criminal History Category, finding that his prior sentence for burglary was, in fact,

a sentence of imprisonment of at least sixty days. The effect of the district court's decisions was to drop Roark's total offense level to 21. In conjunction with his Criminal History Category of V, that resulted in an advisory Guidelines range of 70 to 87 months of imprisonment. After discussing the 18 U.S.C. § 3553(a) factors, the district court chose a sentence at the upper end of the range, sentencing Roark to 87 months of imprisonment.

This timely appeal followed.

II

Roark's first argument is that the evidence before the district court was insufficient to show that he possessed three hundred 40-mg OxyContin tablets, the quantity for which he was ultimately held responsible. The burden of proving drug quantity rests on the government, and the standard of proof is a preponderance of the evidence. *United States v. Hill*, 79 F.3d 1477, 1488 (6th Cir. 1996) (citing *United States v. Clemmons*, 999 F.2d 154, 156 (6th Cir. 1993)). A district court's conclusion that the government has met this burden is subject to limited review. Indeed, "a district court's factual findings regarding the amount of drugs . . . must stand unless [they are] clearly erroneous." *Ibid.* If the precise amount of drugs is uncertain, the district court may make an estimate, but it must "err on the side of caution." *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990). In making its estimate, "the [district] court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3; *see United States v. Christman*, 509 F.3d 299, (6th Cir. 2007).

As an initial matter, Roark argues that, in the present case, the district court was actually limited with respect to the information on which it could rely. He argues that, because he objected to the factual allegations in the PSR, the district court was forbidden from relying on the PSR, without more, to determine drug quantity. In other words, he argues that the government was required to buttress the PSR with additional evidence, such as testimony or affidavits. In support of his position, he cites the Eighth Circuit's decision in *United States v. Poor Bear*, which held that, "[i]f the defendant objects to any of the factual allegations contained [in the PSR] on an issue on which the government has the burden of proof, . . . the government must present evidence at the sentencing hearing to prove the existence of the disputed facts." 359 F.3d 1038, 1041 (8th Cir. 2004).

The *Poor Bear* decision is an unwarranted extension of Federal Rule of Criminal Procedure 32(i)(3)(B). Under that rule, a sentencing court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." In this circuit, we have interpreted Rule 32(i)(3)(B) to stand for the proposition that, if a defendant objects to the PSR, the district court may not simply adopt the PSR's contents, but "must *actually find facts*."[1] *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007). The Federal Rules make clear that this does not necessarily entail taking additional evidence. *See* Fed. R. Crim.

---

[1] Of course, to trigger the procedural safeguards of Rule 32(i)(3)(B), the defendant must "produc[e] some evidence beyond a bare denial that calls the reliability or correctness of the alleged facts into question." *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003) (citation omitted). If the defendant fails to do so, the district court may simply accept the allegations in the PSR as true.

P. 32(i)(2) ("The court *may* permit the parties to introduce evidence on the objections." (emphasis added)); *see also* USSG §6A1.3 ("An evidentiary hearing may *sometimes* be the only reliable way to resolve disputed [sentencing] issues." (emphasis added)). Thus, the *Poor Bear* rule goes too far.

Nor does it appear that the failure to require additional evidence would necessarily offend due process. As the Supreme Court has made clear time and again, "a [sentencing] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the *kind* of information he may consider, or the *source* from which it may come." *United States v. Tucker*, 404 U.S. 443, 446 (1972) (emphasis added); *see Wasman v. United States*, 468 U.S. 559, 563 (1984) ("The sentencing court . . . [is] permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed."). As a result, the fact that certain information is presented to the district court through the PSR, rather than through the testimony of witnesses, is immaterial. So long as the information bears "some minimal indicia of reliability in respect of [the] defendant's right to due process," *United States v. Silverman*, 976 F.2d 1502, 1511 (6th Cir. 1992) (en banc) (internal quotation marks and citations omitted), then the district court is free to consider it, regardless of whether it was offered through the PSR.[2] Indeed, a rule to the contrary would stand in tension with the traditional understanding that a sentencing

---

[2]In *Poor Bear*, the Eighth Circuit rejected this line of thinking, holding that "[t]he PSR is not evidence." 359 F.3d at 1041 (citing *United States v. Wise*, 976 F.2d 393, 404 (8th Cir. 1992) (en banc)). But that holding is wrong. The information in the PSR *is* evidence, at least in the sense that it may be considered at sentencing. *See Silverman*, 976 F.2d at 1511 (referring to the "evidence in the presentence report").

judge is largely untrammeled in the information he may consider. Accordingly, we find *Poor Bear* unpersuasive.

To be sure, the PSR would be inadequate if it contained only bald assertions of ultimate facts. But that inadequacy is a function of the questionable reliability of such information, not the fact that it was communicated through the PSR. Suppose, for example, that the government were attempting to establish the following proposition: Ellis Roark laughed. To do so, the government would surely have to introduce additional evidence if the PSR simply stated, "Roark laughed." From that alone, the district court would be unable to discern the reliability of the information because there is no indication of where it came from. However, the situation would be different if the PSR stated, "Special Agents Keating and Toohey swore under oath that they heard Roark laugh." Then, the district court would be able to discern the source of the information and thereby gauge its reliability. The bottom line is that the district court may rely on the information contained in the PSR if it bears minimal indicia of reliability. And the mere fact that the defendant objects does not magically render such information unreliable. It simply requires the district court to make an independent determination of the facts at issue.[3] *See* Fed. R. Crim. P. 32(i)(3)(B); *White*, 492 F.3d at 416. We therefore reject Roark's argument that his objection to the PSR somehow prohibited the district court from considering the information contained therein.[4]

---

[3]Here, the district court complied with its obligations under Rule 32(i)(3)(B). It discussed the evidence on which it relied, and it articulated findings of fact, ultimately deciding that Roark should be held accountable for three hundred tablets.

[4]Furthermore, even if we were to assume that Roark's argument prevails, the victory would be hollow. This is not a case where the district court relied exclusively on the PSR. In addition, the

That said, we turn now to the question whether the district court committed clear error in holding Roark accountable for three hundred 40-mg OxyContin tablets. Looking to the record, it appears that there is ample support for the district court's drug-quantity determination.[5] First, the CW indicated that she had purchased approximately fifty-four 80-mg tablets from Roark in July 2008.[6] Second, during taped conversations with the CW, Roark stated that he had sold six hundred tablets and that he would attempt to procure one to two hundred more. *Ibid.* Finally, at the time of his arrest, Roark told officers that he had obtained three hundred tablets from a supplier in Michigan. *Id.* at 17. Given this evidence, we are not "left with the definite and firm impression that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citing *United*

district court had before it the sworn affidavit of Officer Chris Edwards, a member of the U.S. Drug Enforcement Administration. Thus, to the extent that the government had an obligation to present additional evidence, that obligation was met.

[5]At the sentencing hearing, even Roark's attorney admitted that the evidence supported a finding that he was responsible for a fairly large quantity of OxyContin ("In all candor, Your Honor, if you're asking me, [c]ould you make a finding based on what's before you on materials that you believe are relevant, I would have to concede . . . that you could make a finding that there are more than the 49.5 pills. But not 600.").

[6]If there is one place where the reliability of the evidence is particularly questionable, it is here. The only source for this information is the CW, whose identity is never revealed. Of course, the use of hearsay from an unidentified informant is permissible, but only "where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means." *Silverman*, 976 F.2d at 1504 (quoting *United States v. Smith*, 887 F.2d 104 (6th Cir. 1989)) (internal quotation marks omitted). Here, there does not appear to be any corroboration of this particular statement. However, Roark does not specifically dispute the reliability of this statement on appeal. Thus, any argument that the statement does not bear sufficient indicia of reliability is unreviewable. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998). Moreover, without the CW's uncorroborated statement, there is still more than enough evidence to support the conclusion that Roark possessed three hundred tablets during the period of the offense, based on Roark's statement to officers during his arrest.

*States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Thus, the district court's determination that Roark possessed three hundred pills should stand.

Roark's arguments to the contrary are unavailing.  At the sentencing hearing, he argued that his statements to the CW were mere "puffing" and that he was simply attempting to make himself out to be a bigger fish in the OxyContin pond than he actually was.  *Id.* at 8.  He also argued that his statement to the police—namely, that he had received three hundred tablets from a Michigan source—was a lie intended to take the heat off of his actual source, who was a local.  *Id.* at 18.  But these explanations are hardly compelling, especially in light of Roark's strong incentive to prevaricate.

Nor is this court bound by the polygraph exams that Roark took and passed.  First of all, polygraphs can be unreliable.  *See United States v. Alexander*, 526 F.2d 161, 167 (8th Cir. 1975) (noting that the "segment of the population referred to as 'pathological liars' can beat the [polygraph] machine").  Even if we assume that the exams were accurate, the results are not particularly compelling because the questions were narrow and larded with qualifiers.  In one of the questions, Roark was asked if he had ever "b[ought] 300 Oxys at any one time."  But the fact that Roark never bought three hundred OxyContin pills *at one time* does not mean that he never bought three hundred pills.  The Great Pyramids of Giza were erected stone by stone, but that does not mean that they were never built.  Admittedly, however, the premise that Roark never bought three hundred pills at any one time appears to conflict with his statement to police, in which he indicated that he was receiving pills in shipments of three hundred.  Yet the statements are fairly easy to reconcile.  It is possible that, when speaking to police, Roark simply approximated the amount of OxyContin he was

receiving. For example, he may have said that he was receiving three hundred pills at a time, when in fact he was receiving, say, two hundred and seventy-five. In that scenario, Roark's statement to officers would be essentially true, yet he would be able to deny having received exactly three hundred pills in a single installment. Furthermore, given Roark's admission that he was receiving multiple shipments of OxyContin, it is not difficult to surmise that he amassed over three hundred pills during the course of his dealings. Thus, the polygraph results, riddled as they were with semantic escape hatches, do not convince us that the district court's factual findings were clearly erroneous.[7]

III

Roark's second argument is that the district court added too many criminal history points based on his prior sentence for burglary. The essence of his argument is that the prior sentence was not a "sentence of imprisonment" as defined in USSG § 4A1.2(b)(1). If he is correct, then his criminal history score is too high, and his sentence is procedurally unreasonable, requiring remand for re-sentencing. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Duckro*, 466 F.3d 438, 446 (6th Cir. 2006). Because this is a legal question involving the application of the Guidelines, we review de novo. *United States v. Hall*, 531 F.3d 414, 416 (6th Cir. 2008).

---

[7]There is another way to harmonize Roark's statements to police and the results of his polygraph examination. For example, it could be that Roark's supplier was "fronting" him the pills. The practice of fronting involves "giv[ing] drugs up front for later payment." *United States v. Clark*, 254 F. App'x 528, 530 (6th Cir. 2007). If Roark's supplier was, indeed, fronting him drugs, Roark could deny that he was in fact buying them. Rather, he was receiving drugs, and paying off a loan.

The steps for calculating a defendant's Criminal History Category are set forth in USSG §§ 4A1.1 and 4A1.2. At the outset, the district court must assign zero to three criminal history points for each of the defendant's prior sentences.[8] USSG § 4A1.1; *United States v. Ault*, 598 F.3d 1039, 1040-41 (8th Cir. 2010). The number of points for each prior sentence depends on several factors, including whether the sentence required a term of imprisonment, and if so, the length of the term imposed.[9] USSG § 4A1.1(a)-(b). If the prior sentence was a "sentence of imprisonment of at least sixty days," the district court must add no fewer than two criminal history points.[10] *Id.* § 4A1.1(b). On the other hand, if the prior sentence was *not* a "sentence of imprisonment," then only one point is added. *Id.* § 4A1.1(c). Once points are assigned for each prior sentence, the district court's next step is to determine whether the present offense was committed while the defendant was "under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." *Id.* § 4A1.1(d). If so, an additional two points are added. *Ibid.* From there, the final step is to determine whether the present offense was "committed . . . less than two years after release from imprisonment on a sentence counted under (a) or (b) . . . ." *Id.* § 4A1.1(e). If it was, the district court must add either one or two additional points, depending on whether points

---

[8]The term "prior sentence" is a term of art meaning "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of nolo contendere, for conduct not part of the instant offense." USSG § 4A1.2(a)(1).

[9]Another relevant factor is the type of offense for which the sentence was imposed. USSG § 4A1.2(c).

[10]Three points are added if the term of imprisonment exceeded "one year and one month." USSG § 4A1.1(a).

were added under § 4A1.1(d). *Id.* § 4A1.1(e). The district court must then total the points, which results in the defendant's criminal history score. That, in turn, dictates the defendant's Criminal History Category. *See United States v. Corley*, 978 F.2d 185, 186 n.2 (5th Cir. 1992).

In the present case, the focus of our inquiry is the district court's treatment of Roark's prior sentence for burglary. In calculating his criminal history score, the district court concluded that the prior sentence was a "sentence of imprisonment of at least 60 days" and added two criminal history points under USSG § 4A1.1(b). The district court then added a third point under USSG § 4A1.1(e) because Roark had committed the present offense—possession of OxyContin—within two years of his release from imprisonment on the burglary charge. Roark argues that these points should not have been added because his prior sentence for burglary was not a "sentence of imprisonment," but rather a suspended sentence of a sentence of probation.

Under USSG § 4A1.2(b)(1), "[t]he term 'sentence of imprisonment' means a sentence of incarceration and refers to the maximum term imposed." For a sentence to meet this definition, "the defendant must actually have served a period of imprisonment on [that] sentence." USSG § 4A1.2 comment. (n.2). "If part of a sentence of sentence of imprisonment was suspended, "sentence of imprisonment" refers only to the portion that was not suspended." *Id.* § 4A1.2(b)(2). Thus, a fully suspended sentence is not a sentence of imprisonment. *Id.* § 4A1.2(a)(3); *United States v. Murphy*, 241 F.3d 447, 459-60 (6th Cir. 2001). Similarly, a sentence of probation does not qualify as a sentence of imprisonment, "unless a condition of probation requiring imprisonment of at least sixty days was imposed." USSG § 4A1.2 comment. (n.2); *United States v. Cruz-Alcala*, 338 F.3d 1194, 1199 (10th Cir. 2003).

Here, Roark's sentence for burglary was probated, but, as a "condition" of probation, he was given credit for 85 days of time served. In *Cruz-Alcala*, the Tenth Circuit was confronted with a similar sentence. There, the defendant was placed on probation for a period of three years. *See Cruz-Alcala*, 338 F.3d at 1199. However, as a condition of probation, he was "committed to the custody of the sheriff . . . for a period of 320 days with 214 days credit for time served plus 106 days conduct credit." *Ibid.* The Tenth Circuit held that this was a sentence of imprisonment for purposes of the Guidelines. In doing so, the court relied on Application Note 2 to USSG § 4A1.2 and concluded that a sentence of probation is a sentence of imprisonment as long as it is conditioned on the defendant spending some time in custody, whether before or after the sentence is actually imposed. *See ibid.* ("[I]t is irrelevant that the . . . sentence was satisfied by 'time served' and good-conduct credit.").

It could be argued that the present case is distinguishable from *Cruz-Alcala.* There, the state court explicitly indicated that a term of imprisonment was required as a condition of probation. By contrast, Roark was simply given credit for time served; the state court did not proclaim that the time was being put toward a required term of imprisonment. However, Roark's credit for time served was plainly listed as a *condition* of his probation. The clear implication is that the state court would not have sentenced Roark to probation if he had not spent some time in jail. *See United States v. Staples*, 202 F.3d 992, 997 (7th Cir. 2002) (noting that "[c]redit for time served evinces the [state] court's determination that the offender must spend some time in jail but has already served that time"). In other words, it appears that the state court's leniency was engendered by its perception that Roark had already received an appropriate punishment. Accordingly, we conclude that, although Roark

- 13 -

received a probated sentence, it was nonetheless a "sentence of imprisonment" for purposes of USSG § 4A1.2(b) because it was conditioned on an 85-day term of incarceration. *See Cruz-Alcala*, 338 F.3d at 1199; *United States v. Mendoza-Morales*, 347 F.3d 772, 778 (9th Cir. 2003) ("[I]ncarceration as a condition of probation is treated in the same way as ordinary incarceration.").

Roark argues that this result is inappropriate in light of KRS § 532.120(3), a Kentucky statutory provision that requires sentencing judges to give credit for time served. Specifically, § 532.120(3) provides that "[t]ime spent in custody prior to the commencement of a sentence as a result of the charge that culminated in the sentence [must] be credited by the court imposing sentence toward service of the maximum term of imprisonment." Given this requirement, Roark argues that, by granting him credit for time served, the state court was simply fulfilling its statutory obligation, as opposed to imposing incarceration as a condition of probation.

But this argument fails. Although the state court was required to grant credit for time served, it was not required to make the time served a condition of probation. Indeed, time served typically has nothing to do with probation, unless the time already spent in custody is what prompted the judge to impose probation in lieu of incarceration. Under KRS § 533.030(6), a sentencing judge "may require as a condition of the sentence that the defendant submit to a period of imprisonment in the county jail or to a period of home incarceration at whatever intervals, consecutive or nonconsecutive, the court shall determine." That is what happened in this case, and it is therefore appropriate to deem Roark's prior sentence a "sentence of imprisonment."[11]

---

[11]Roark also argues that it is unfair (and possibly unconstitutional) to count time served as a sentence of imprisonment because time served is often a function of a defendant's inability to make

IV

For the foregoing reasons, we AFFIRM Roark's sentence.

---

bail. He argues that this would lead to disparate treatment based on wealth. People with enough money to make bail would often receive lower criminal history scores because they would be able to avoid prior sentences of imprisonment. By contrast, people with insufficient funds would be made to remain in jail and thereby rack up more criminal history points. Although this argument has some appeal, it has been summarily dismissed by a number of courts. *See United States v. D'Oliveira*, 402 F.3d 130, 132 (2d Cir. 2005); *United States v. Atkinson*, 15 F.3d 715, 721 (6th Cir. 1994). One obvious reason that this argument has been rejected is the ability of a district court to vary or depart downward if it believes that a given defendant's criminal history score has been overstated. *See United States v. Ledesma*, 27 F. App'x 263, 264 (6th Cir. 2001) ("A district court has the discretion to depart downward from the guideline range where 'a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes.'" (quoting USSG § 4A1.3)).