**UNITED STATES of America, Plaintiff,**

**v.**

**David CRUMBY, Defendant.**

**No. CR 94–122–PHX–RGS.**

United States District Court,
D. Arizona.

July 7, 1995.

Thomas P. Hannis, Phoenix, AZ, for plaintiff.

Sally S. Duncan, Phoenix, AZ, for defendant.

### ORDER

STRAND, District Judge.

## INTRODUCTION

On January 17, 1995, Defendant, David Crumby, moved the Court for an evidentiary hearing as to the reliability and admissibility of polygraph evidence. The Defendant and Plaintiff have submitted a number of filings and evidentiary materials with respect to the admissibility of polygraph evidence. An extensive evidentiary hearing was held concerning the issue. The motion has been fully briefed and is ready for disposition.

## BACKGROUND

On March 31, 1994, Defendant, David Crumby, was indicted on one count of Bank Robbery and Aid and Abet, in violation of 18 U.S.C. §§ 2113(a) and 2. The government contends that Defendant, who worked at

Bank One in Chandler, Arizona, participated in robbing this bank on April 30, 1993. Thomas Riley, who admitted robbing the bank, has identified David Crumby as the "inside man" in the robbery.

David Crumby, who has no prior record of breaking the law, has maintained his innocence since being indicted. According to Defendant, in an attempt to demonstrate his innocence, Defendant submitted to a polygraph examination on November 28, 1994. Tom Ezell, a former polygrapher for the Phoenix Police Department, administered the polygraph examination. Mr. Ezell evaluated the results of the polygraph exam and determined that Defendant was being truthful on his responses to questions concerning the bank robbery. According to Mr. Ezell, the Defendant passed the test—that is Defendant truthfully stated that he did not commit the crime in question.

## DISCUSSION

The issue presented to this Court is twofold: is polygraph evidence admissible, and if so, under what circumstances should it be admitted? The answer to this question has historically varied from circuit to circuit, and over time. A brief review of the Ninth Circuit's approach to polygraph evidence, as well as the other circuits' approaches, will illustrate the evolution of the science of polygraphy and the reaction of federal courts to this evolution.

## A. ADMISSIBILITY OF POLYGRAPH EVIDENCE IN FEDERAL COURTS

### 1. Ninth Circuit Approach

The Ninth Circuit has traditionally "expressed an inhospitable view towards the admission of unstipulated polygraph evidence." *Brown v. Darcy,* 783 F.2d 1389, 1394 (9th Cir.1986). In the seminal case of *Brown v. Darcy,* the Ninth Circuit held that absent a stipulation, polygraph evidence was *per se* inadmissible under the Federal Rules of Evidence. The rationale underlying *Brown* was that polygraph evidence was of "questionable reliability" and presented a "great potential for prejudice from inaccurate polygraph evidence." *Brown,* 783 F.2d at 1394–97. In *Brown,* the Court stated that

reliability was the most persuasive reason for excluding polygraph evidence. This conclusion was based on the Court's view that polygraph evidence was an accurate predictor of truthfulness anywhere from seventy to ninety-five percent of the time. *Id.*

In addition to the shortcomings in reliability, the *Brown* Court stressed grave concern over the prejudicial effect of admitting polygraph evidence. The four main concerns articulated by the Court were: (1) polygraph evidence is likely to be "shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi," *Brown,* 783 F.2d at 1396, *citing United States v. Alexander,* 526 F.2d 161, 168 (8th Cir.1975), thus giving overly significant, if not conclusive weight to the expert testimony; (2) polygraph evidence is an opinion regarding the ultimate issue in the case, rather than just one relevant issue; (3) polygraph evidence infringes on the jury's role in determining credibility; and (4) judicial resources will be unduly consumed based on the great deal of testimony required in cases where polygraph evidence is admitted. *Brown,* 783 F.2d at 1396–1397.

In the Ninth Circuit, there are two exceptions to the *per se* inadmissibility rule: stipulated polygraph evidence and polygraph evidence used for the purposes of demonstrating an operative fact. Stipulated polygraph evidence has been in use in the Ninth Circuit for a number of years and its use is prevalent in most circuits. The operative fact exception has also been used with a good deal of frequency. In *United State v. Bowen,* 857 F.2d 1337 (9th Cir.1988), the Ninth Circuit held that "if polygraph evidence is being introduced because it was relevant that a polygraph examination was given regardless of the result, then it may be admissible." *Id.* at 1341. Thus, by way of example, if a Defendant wanted to introduce polygraph evidence to demonstrate that he could not have committed a crime, because he was taking a polygraph test at the time of the alleged crime, it might be admissible. The purpose of introducing the polygraph evidence in this previous hypothetical would be to show an operative fact—the Defendant was taking the test at the time of the crime. The truth or

falsity of the results of the test would be irrelevant.

Similarly, in *United States v. Miller,* 874 F.2d 1255 (9th Cir.1989), the Court stated that the government may demonstrate an operative fact using polygraph evidence if the evidence is narrowly tailored. *Id.* at 1262. In *Miller,* the government wanted to establish that the Defendant's admission was reliable because he decided to admit to committing the crime after he was told he failed a polygraph examination. This "limited purpose" evidence might be admissible because whether he in fact failed the test or not was irrelevant. The purpose of evidence was to show that after *learning* he failed the test, the Defendant decided to admit to committing the crime. The *Miller* Court, however, reversed the district court's decision to admit the polygraph evidence because it was not narrowly tailored. The Court held that the district court abused its discretion in permitting the specific questions asked on the polygraph examination to be introduced at trial.

Lastly, in *Toussaint v. McCarthy,* 926 F.2d 800 (9th Cir.1990), *cert. denied* 502 U.S. 874, 112 S.Ct. 213, 116 L.Ed.2d 171 (1991), the Ninth Circuit called into question the traditional view in the Circuit that polygraph evidence is unreliable. The Court favorably cited an important case from the Eleventh Circuit. The *Toussaint* Court stated: "a careful review of polygraph evidence by the Eleventh Circuit notes that 'in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool.'" *Toussaint,* 926 F.2d at 803, *citing United States v. Piccinonna,* 885 F.2d 1529, 1535 (11th Cir.1989) (*en banc*). Thus, the Ninth Circuit has called into question its traditional view of polygraph evidence. The Eleventh Circuit's approach in *Piccinonna* challenges the traditional rule of *per se* inadmissibility.

### 2. The Eleventh Circuit and Other Circuits' Approaches

In *Piccinonna,* the Eleventh Circuit outlined the differing approaches taken by the various circuits. *Id.* at 1533–1536. The approaches may be divided into three basic camps. First, the Fourth, Fifth, and District of Columbia Circuits adhere to the *per se* inadmissibility approach. *Id.* Second, the Eighth Circuit allows stipulated polygraph evidence and has been leaning towards greater admissibility. *Id.* And third, the Ninth Circuit, as well as the Third, Sixth, Seventh, and Tenth, permit polygraph evidence pursuant to a stipulation and under special circumstances. *Id.* The most common special circumstance is when the evidence is introduced to establish an operative fact.

In *Piccinonna,* the Court fashioned a novel approach to the admissibility of polygraph evidence. The decision to change the legal landscape was based on the Court's view that advances in the science of polygraph have greatly increased the reliability of the tests and consequently reduced many of the prejudicial effects. The Eleventh Circuit outlined two situations where polygraph evidence may be admitted. *Id.* at 1536. The first instance is stipulated polygraph evidence. The second instance, the one most relevant for the purposes of the instant case, is polygraph evidence used to impeach or corroborate the testimony of a witness at trial.

The Court stated that polygraph evidence may be used to impeach or corroborate, subject to three preliminary requirements. First, the party planning to use the evidence must provide sufficient notice to the opposing party. Second, the opposing party must be given a reasonable opportunity to have its own expert administer a polygraph examination which is materially similar to the previously taken examination. Third, the admissibility of evidence is subject to the relevant provisions of the Federal Rules of Evidence, specifically, Fed.R.Evid. 608 and 702. Thus, *Piccinonna* creates a new exception to the *per se* inadmissibility rule.

### B. REASONS FOR REASSESSING THE PER SE INADMISSIBILITY RULE

There are a number of reasons for reexamining the *per se* rule prohibiting introduction of unstipulated polygraph evidence in the Ninth Circuit. First, the facts of this case differ dramatically from the previous line of Ninth Circuit cases. In the present case, a criminal defendant who claims his innocence has taken and passed a polygraph examina-

tion, and seeks to introduce this potentially exculpatory evidence. Second, the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), necessarily causes courts to reconsider the traditional approaches to the admissibility of scientific evidence under Fed.R.Evid. 702. In *Daubert,* the Supreme Court abandoned the *Frye* test [1] and outlined a new method for federal district courts to follow when considering whether to admit scientific evidence. Third, based on the evidence presented by the parties, the Court finds that there has been a significant increase in the reliability of polygraph evidence over recent years.

And fourth, the *Piccinonna* case sheds an insightful light on the admissibility of polygraph evidence. This Court believes that the wisdom and insightful analysis of the *en banc* Eleventh Circuit can be harmonized with prior Ninth Circuit precedent. Under certain specific and narrowly tailored situations, polygraph evidence may appropriately be used to impeach or corroborate a testifying witness.

In general, the Court concludes that the maturation of the science of polygraphy, when properly coupled with a cautious acceptance of this science by federal courts, will lead to a fairer and more just system of criminal and civil jurisprudence. Courts must assist the trier of fact in its quest to ascertain the truth, while ensuring that the trier of fact is not unduly mislead or prejudiced. Thus, the Court is compelled to reexamine the current state of the law based on the particular set of facts in this case, the advances in the science of polygraphy, and the reasoning of *Piccinonna, Daubert* and *Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d 1311 (9th. Cir.1995) (*"Daubert II "*).

## C. DAUBERT: DETERMINING THE RELIABILITY OF POLYGRAPH EVIDENCE

The Court must consider whether polygraph evidence is reliable under *Daubert.* This inquiry must precede a discussion of the prejudicial effects of using polygraph evidence and the purposes for which polygraph evidence should be admitted. *Daubert* held that the *Frye* "general acceptance" test was superseded by the adoption of the Federal Rules of Evidence. *Daubert* states that expert testimony will be admissible under Fed. R.Evid. 702 if it is "scientific knowledge" and if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795. The evidence must be supported by scientific method and assumptions and the expert testimony must "fit" or be related to the necessary facts in the case. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2795–96.

■ Specifically, the Supreme Court delineated a non-exhaustive list of factors to be considered by a district court. *Daubert II,* 43 F.3d at 1316. The factors are not talismanic; they are a guide to assist courts in determining whether scientific evidence is admissible under Fed.R.Evid. 702. Among the most relevant considerations are: whether the theory can be (or has) been tested by means of scientific methodology; whether the theory or technique has been subjected to peer review and publication; whether there is a known or potential error rate; and whether the science has been generally accepted in the relevant scientific community. The Ninth Circuit in *Daubert II* elucidated the Supreme Court's opinion by stating that the most persuasive reason for concluding that an expert's testimony is derived from scientific method is that "the testimony . . . is based directly on legitimate, preexisting research unrelated to the litigation." *Daubert II,* 43 F.3d at 1317. Thus, this Court must analyze the testimony, arguments, evidence, and data presented by the parties in order to determine if polygraph evidence is reliable evidence based on scientific method. Although the *Daubert* factors are not intended as a inflexible checklist, the Court will analyze each factor.

### 1. Tested by Scientific Method

■ On May 25, 1995 and June 6, 1995, Dr. David Raskin, an eminently qualified ex-

---

1. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923). The *Frye* test stated that scientific evidence was admissible if it was based on a scientific technique generally accepted as reliable within in the scientific community. *Id.*

pert in the field of polygraphy, testified as to the scientific merit of polygraphy. Dr. Raskin has a Masters degree and a Ph.D. in psychology from the University of California at Los Angeles. Dr. Raskin has published numerous articles on polygraphy, is a member of many professional and honorary organizations, and in general, is one of the leading experts in the field of polygraphy. Dr. Raskin is currently a professor of psychology at the University of Utah.

Dr. Raskin testified that polygraphy has been tested by scientific method. Specifically, Dr. Raskin testified that the control question polygraphy examination, the type of examination employed in the present case, is based on scientific method and has been subjected to extensive testing. In conducting a control question test, the polygraph examiner asks a series of control questions and relevant questions and compares the differences in the subject's physiological responses to each category of question. By way of example, if one were suspected of a stealing a pick-up truck on November 3, a control question might be: for the first twenty years of your life, did you ever steal or think of stealing anything? The relevant question might be: did you steal the pick-up truck on November 3?

The control questions are intentionally vague and intended to cause an innocent person to be unsure about their answers because although they are innocent of the specific crime in question, they have thought about stealing at one time or another during their life. Thus, the innocent person would be more concerned and uneasy about answering the control question than the relevant question because they are sure they did not commit the specific crime, but are uneasy about answering that they have thought about stealing at some point in their life. See John Kircher and David C. Raskin, *Polygraph Techniques: History, Controversies, and Prospects* in Peter Suedfeld and Philip Tetlock, (eds.), *Psychology and Social Policy*, 295, 297 (1992) ("[c]ontrol questions are designed to arouse the concern of innocent subjects, and it is expected that they will react more strongly to them than to the relevant question").

The polygraph examiner then analyzes the differences in physiological responses to the various control and relevant questions. Dr. Raskin testified about the scientific techniques involved in measuring physiological responses. See David C. Raskin, *The Polygraph in 1986: Scientific, Professional and Legal Issues Surrounding Application and Acceptance of Polygraph Evidence,* 1986 Utah L.Rev. 29 (1986). The physiological responses are measured by machines recording changes in blood pressure, breathing activity, sweating, etc. *Id.*

In short, Dr. Raskin and the numerous authorities cited by Defendant strongly support the view that the science of polygraphy has been subjected to vigorous scientific testing and the assumptions underpinning the science have been deeply analyzed by those in the field of polygraphy and psychophysiology. The Court finds that *Daubert's* first requirement has been satisfied.

### 2. Peer Review and Publication

There have been numerous scholarly articles published concerning the validity and reliability of polygraph evidence. Dr. Raskin's work has been reviewed and cited by a great many scientists in the field of polygraphy, and the more general field of psychophysiology. Dr. Raskin explained that it is very difficult to publish an article in a polygraphy journal due to the stringent peer review. The Defendant has submitted for the Court's consideration several scholarly works which review the work of others in the field and analyze the scientific strengths and weaknesses of each study. *See e.g.* Charles R. Honts and Mary V. Perry, *Polygraph Admissibility: Changes and Challenges,* 16 Law and Human Behavior 3 (1992). The Court finds that the science of polygraphy and its underlying scientific principles have been subjected to extensive peer review and publication.

### 3. Known and Potential Error Rates

The known error rates for the science of polygraphy are remarkably low. The prejudice which might result from one polygraph test which wrongly suggests that an innocent person committed crime is perhaps intoler-

able. However, putting aside the potential for prejudice for the moment, the error rates in the field of polygraphy are extremely low, especially when compared to other more inexact forensic sciences. Dr. Raskin testified, and much of recent polygraph literature confirms, that polygraph examinations are roughly ninety percent accurate. *See e.g.* John A. Podlesny and David C. Raskin, *Effectiveness of Techniques and Physiological Measures in the Detection of Deception,* Vol. 15 No. 4 Psychophysiology (1978); *see also* David C. Raskin, et. al., *Recent Laboratory and Field Research on Polygraph Techniques* in J.C. Yuille (ed.), *Credibility Assessment* (1989). Dr. Raskin testified that field tests were conducted for the National Institute of Justice on the accuracy of polygraph examinations. In 1988, Dr. Raskin and others published this survey which reported accuracy rates in excess of ninety percent. *See* David C. Raskin, et. al., *A Study of the Validity of Polygraph Examinations in Criminal Investigation,* Final Report to the National Institute of Justice (1988). Dr. Raskin further testified that numerous studies throughout the world have consistently demonstrated an accuracy rate of roughly ninety percent.

Furthermore, Dr. Raskin testified, and the government's proposed findings of facts specifically state that "[i]t is much more likely, by a ratio of 2 to 1, that inaccurate polygraph results will reflect a truthful individual appearing to be deceptive rather than a deceptive individual appearing to be truthful." Government's Proposed Findings of Fact, ¶ 3. Put another way, it is twice as likely that an innocent truthful subject will incorrectly be deemed deceptive as to his responses about not committing the crime, and thus wrongly branded guilty, than a guilty deceptive person incorrectly deemed truthful as to his responses about not committing the crime, and thus wrongly characterized as innocent. Thus, the error rate for tests depicting truthful subjects is five percent and the error rates for tests depicting deceptive subjects is ten percent. In the present case, Mr. Crumby appeared to be truthful, and thus, the statistical probability of Mr. Crumby actually being deceptive is roughly five percent. The government did not present

any persuasive evidence suggesting that recent studies dispute Dr. Raskin's testimony and the scholarly articles supporting Dr. Raskin's position.

### 4. General Acceptance in Relevant Community

The use of polygraph evidence is widespread. A 1993 survey of randomly selected members of the Society for Psychophysiological Research found that a substantial amount of psychophysiologists accept the validity of the science of polygraphy. *See* Susan Amato and Charles R. Honts, *A Survey of the Society for Psychophysiological Research Regarding the Polygraph* (1993). This study suggests that there is a large community of psychophysiologists who accept and endorse the use of polygraph examinations in a variety of circumstances. Although approximately a third of the respondents to this survey questioned the use of polygraphy, many of these psychophysiologists were not necessarily polygraphers, and thus their status in the relevant scientific community is questionable. Furthermore, the court does not place much emphasis on *Daubert's* inclusion of the *Frye* "general acceptance" test in the new Rule 702 analysis. Based on the facts in this case and the nature of the science of polygraphy, the general acceptance component of *Daubert* is not a particularly significant factor. Nevertheless, the Defendant has shown that polygraphy is accepted by polygraphers and its use is endorsed by a number of organizations.

### 5. Research's Relationship to the Litigation

The Ninth Circuit, in *Daubert II,* stated that the most persuasive reason for concluding that an expert's testimony is derived from scientific method is that "the testimony ... is based directly on legitimate, preexisting research unrelated to the litigation." *Daubert II,* 43 F.3d at 1317. The modern science of polygraphy has been in existence for approximately twenty-five years. The testimony of Dr. Raskin was based on legitimate, preexisting research. *Daubert II* raises the concern that "scientific" evidence will be created solely for the purposes of litiga-

tion. Polygraph evidence is used in a wide variety of circumstances including law enforcement, employment testing, etc. The research has not been developed for the purposes of litigation and thus meets the Ninth Circuit's criterion.

### 6. Summary of Findings: Polygraph Evidence Reliable under Daubert

The science of polygraphy has made significant progress over the past decade. Polygraph exams are admitted in most federal courts pursuant to a stipulation. The widescale use of stipulated polygraph evidence in federal courts undermines the argument that polygraph evidence is inherently unreliable. The testimony of Dr. Raskin and the numerous publications submitted by Defendant strongly suggest the reliability of polygraph evidence. The government did not have an expert testify, and the government failed to present evidence that Dr. Raskin's testimony concerning error rates was inaccurate. In fact, the government appears to accept the error rates in their proposed findings of fact. *See* Plaintiff's Proposed Finding of Facts and Conclusions of Law.

As the *Piccinonna* Court so aptly noted: "we believe that the science of polygraphy has progressed to a level of acceptance sufficient to allow the use of polygraph evidence in limited circumstances where the danger of unfair prejudice is minimized." *Piccinonna,* 885 F.2d at 1537. This Court's findings confirm the reasoning and conclusions of *Piccinonna.*

The Court finds that polygraph evidence is sufficiently reliable under *Daubert* to be admitted as scientific evidence under Fed. R.Evid. 702. However, there are a great many other concerns which require this Court to exercise extreme caution in allowing the evidence to be admitted. *Daubert* requires this Court to consider the other Federal Rules of Evidence, the purposes for which the evidence should be admitted, and in general, the prejudicial effect of admitting polygraph evidence.

### D. PROBATIVE AND PREJUDICIAL NATURE OF POLYGRAPH EVIDENCE

Federal Rule Evidence 403 provides that relevant evidence may be excluded if its probative value is outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403. There can be little doubt that polygraphy evidence, if reliable, is relevant evidence with an enormous amount of probative value. In cases such as the present case, the polygraph examination is probative of whether the subject is being truthful about whether he or she committed the crime in question. Clearly, the probative value of such evidence is beyond question.

However, the potential prejudicial effects of permitting a jury to consider a polygraphy examination are enormous, and thus rather disturbing. Therefore, nothing less than the utmost caution must be exercised by courts permitting the introduction of polygraph evidence. The evidence must be narrowly tailored and admitted only for a limited purpose. Before outlining the manner in which the Defendant may present the polygraph evidence, and the purposes for which it may be used, the Court must examine the traditional bases for excluding evidence on the grounds of prejudice. In this Court's view, many of the arguments concerning prejudice are either overstated or unfounded. Moreover, in cases such as the present one, these prejudice arguments are unjustly used to preclude a self-proclaimed innocent man from proving his innocence with the help of scientific evidence.

### 1. The Fear of Technology and "Big Brother's" Use of Technology

One of the main undercurrents of the "prejudice" argument is society's fear of technology. The problem is not so much technology itself, but improper utilization of the technology. Specifically, the relevant considerations for determining how much caution a court should employ in permitting scientific or technical evidence into evidence are: who is attempting to use the technology and for what purpose. In the present case, it is a man who proclaims his innocence. Most of the cases considering the use of

polygraph evidence have only considered the prejudicial effects of a polygraph examination which brands an innocent person as a guilty one. In the present case, it is not Orwell's "Big Brother" who wishes to use its authority to require that all criminal suspects take polygraph examinations, but rather a self-proclaimed innocent individual who wishes to prove his innocence using polygraph evidence. In this country, a criminal defendant is afforded many protections—ie. presumption of innocence, right to obtain certain exculpatory evidence, "beyond a reasonable doubt" norms, etc. This country's long history of affording criminal defendants with these protections mandates that the Court consider the value of polygraph technology and its ability to foster justice and provide the criminal defendant in the present case with a fair trial.

The critical remaining issue, thus, is: in what manner should the evidence be used. As stated throughout, the admission of polygraph evidence must be narrowly tailored and for a limited purpose. The nature of the limited purpose depends on the facts of the case, the "fit" between the facts and polygraph evidence, and the reliability of the evidence.

### 2. Time Consumption

Another frequently levied criticism is that courts consume too much time considering the issues of polygraph evidence. Although a great deal of time is consumed considering polygraph evidence, as more and more courts develop a thorough approach to the admissibility of polygraph evidence, and establish the purposes for which the evidence may be used, the required amount of time will decrease. Further, this argument has little merit in a criminal trial where the evidence is extremely probative. Courts should consider ways in which to limit the amount of time and energy expended on polygraph issues. This Court has noted this concern, and to the extent that the concern is pertinent, the Court has factored it into its consideration and ultimate decision.

### 3. Aura of Infallibility

Perhaps the most meaningful criticism is that "[w]hen polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi." *Brown*, 783 F.2d at 1396, *citing United States v. Alexander*, 526 F.2d 161, 168 (8th Cir.1975). Courts throughout the country have expressed the concern that: "despite [juries'] sophistication and increased educational levels ... [they] are still likely to give significant, if not conclusive, weight to the polygraphist's opinion" as to the Defendant's propensity for being truthful. *Id.* Thus, the argument is that the jury's role as determiner of credibility will be unduly infringed upon by admission of polygraph evidence.

There are a number of counter-arguments to this criticism. First, and foremost, stipulated polygraph evidence is admitted in most circuits in the United States. The stipulation does not magically expunge the "Oracle of Delphi" prejudice argument. Second, vigorous cross-examination can rectify much of the prejudice. The cross-examiner can reinforce the jury's role as the determiner of credibility by presenting evidence of the error rates of polygraph examinations and the particular problems with the examination in the case in question. In the present case, for example, the government has presented ample evidence of how a specific polygraph examination can be flawed. Thus, this evidence will serve to fortify the jury's place as the determiner of credibility. Third, proper limiting instructions will explain to the jury that polygraph evidence is one piece of evidence to be weighed by the jury along with the other evidence. Finally, if polygraph evidence is used in a limited manner, the jury's role will be maintained.

### 4. Opinion Regarding Ultimate Issue

A similar line of argument suggests that polygraph evidence is prejudicial because it is evidence of the ultimate issue in the case. The polygraph expert, according to this line of reasoning, will testify that the subject answered truthfully or falsely about committing the crime. This concern is well-founded. The single most vital responsibility of this Court is to ensure that the jury does not confuse the polygrapher's ability to deter-

mine the truthfulness of the subject, with the polygrapher's ability to determine the ultimate issue in the case. Courts have appropriately recognized the problems attendant with a machine determining the ultimate issue in criminal and civil cases. Thus, in limiting the purpose for which the polygraph evidence may be admitted, the Court's foremost concern will be the potential for confusing or misleading the jury.

### E. A LIMITED PURPOSE FOR POLYGRAPH EVIDENCE

The use of polygraph evidence at trial must be narrowly tailored to the circumstances for which it is relevant, and it must be circumscribed so as to limit its potential prejudicial effects. Polygraph evidence may be admissible under a number of Federal Rules of Evidence. The Court must consider the interaction of Rules 403, 404, 608, 702. The polygraph evidence is admissible under Rule 702. Thus, scientific evidence about the validity of polygraph examinations is admissible. In the present case, both sides may present evidence concerning the general science of polygraph evidence. However, this evidence must be circumscribed based on Rules 403 and 608.

As stated earlier, the main concern of the Court is that the jury will confuse the polygrapher's testimony about the witness's credibility with respect to issues in the case and the polygrapher's opinion about whether the Defendant committed the crime in question. Therefore, the polygraph evidence may only be used to impeach or corroborate the *credibility* of the Defendant. Thus, if the Defendant takes the stand and testifies that he did not commit the crime, and the government impeaches his credibility, then the Defendant may support his credibility with the use of the polygraph evidence. The credibility of the witness can only be supported with evidence that Defendant took a polygraph examination in connection with this case, and passed the examination.

The Defendant will not be permitted to testify about the specific questions used on the examination or his specific responses to those questions. Similarly, the expert witnesses and character witnesses may testify

as to the reliability and ultimate results of the polygraphy test, but cannot present the specific questions or specific responses. *See Miller*, 874 F.2d at 1262 (the marginal probative value of admitting the specific questions was greatly outweighed by its prejudicial effect). The Court finds that the prejudicial effect of permitting the jury to hear the specific responses to the question of whether Defendant committed the ultimate crime in the case is overwhelmingly prejudicial.

■ *Piccinonna* appears to hold that a polygraph examiner's testimony would be admissible under Fed.R.Evid. 608(a). Rule 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to *character* for truthfulness or untruthfulness, and (2) evidence of truthful *character* is admissible only after the *character* of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Fed.R.Evid. 608(a) (emphasis added). On remand, the district court in *Piccinonna* held that the results of one specific polygraph examination is an inadequate foundation upon which to base an opinion about character. *United States v. Piccinonna*, 729 F.Supp. 1336 (S.D.Fla.1990). This Court disagrees with the *Piccinonna* district court. Courts allow a broad range of character evidence. Rule 608(a) provides that credibility may be attacked or supported by evidence in the form of *opinion or reputation*. Reputation evidence clearly would require a character witness to know a great deal about a witness's character for truthfulness.

However, the necessary qualifications for a witness who provides "evidence in the form of an opinion" is quite different. A polygrapher is an expert in determining credibility. If a party can lay the proper foundation to qualify such a witness, then the requirements of Rule 608(a) will be met. The polygrapher will not testify that he knows of the subject's reputation for honesty, but that as an expert in determining credibility, with respect to this case, the subject has demonstrated a

character for truthfulness. The fact-finder is not concerned with whether the witness was truthful ten years ago. The most relevant time period is from the date of the crime to the date of the witness testifying. An expert in the field of polygraphy is well-qualified to give his "opinion" with respect to the truthful character of the witness during this time period. The polygrapher's opinion, which is based on scientific principles, will be far more informed than a lay opinion which generally states: "I have known the Defendant for three years, and I know him to be truthful."

Accordingly, the polygrapher's testimony is admissible under 608(a) and 702. Furthermore, Rule 403 requires the Court to limit the prejudicial effect of the polygrapher's statements. Thus, the polygrapher may testify as to the validity of the test, but the polygrapher, and other polygraphy experts, may not testify as to the specific questions and responses of the Defendant.

■ With respect to the Defendant, if he testifies, and his credibility is impeached, he may support his own credibility by stating that he passed a polygraph examination in connection with this case. This testimony is admissible under the "impeachment by contradiction" exception to 608(b). The district court in *Piccinonna* properly concluded that courts must consider Rule 608(b). However, the district court reasoned that polygraph evidence was inadmissible for the purposes of attacking or supporting credibility because it was extrinsic evidence. Although, Rule 608(b) does not permit the use of extrinsic evidence, "where evidence is *also* relevant to disproving a defense, it may be admitted." *United States v. Sanchez–Robles*, 927 F.2d 1070, 1078 (9th Cir.1991) (citations omitted). So long as the Defendant's credibility and his statements concerning his participation in the robbery are impeached, the polygraph evidence will be admissible. The polygraph evidence may be used to support the Defen-

dant's credibility if he is impeached on both grounds.

The Ninth Circuit has stated that Rule 608(b) "prohibits a party from introducing extrinsic evidence '*solely* for the purposes of attacking the credibility of a witness.'" *Sanchez–Robles*, 927 F.2d at 1078, *citing United States v. Bosley*, 615 F.2d 1274, 1276 (9th Cir.1980). In the present case, the polygraph evidence's primary purpose is to show credibility, but it also is evidence that shows Defendant was willing to take a polygraph, and in fact, passed the examination. Although the jury will not be permitted to infer from the test that because the Defendant passed the test, he could not have committed the crime, the jury may draw the inference that Defendant took the test because he believed he was innocent.

Furthermore, Rule 608(b) should be narrowly read. It should not be read in a manner which precludes a criminal defendant from supporting his credibility where it has been attacked. A polygraph examination is highly probative evidence of a criminal defendant's propensity for truthfulness with respect to the issues in the case. The rationales underlying 608(b)'s exclusion of extrinsic evidence—i.e. time consumption, confusion to the jury, lack of relevancy, etc.—are greatly outweighed by the probative value of the Defendant's polygraph evidence and the interests of justice. Thus, so long as the government impeaches Defendant's testimony by contradiction and impeaches the credibility of the Defendant, the Defendant may support his testimony by providing evidence that he took a polygraph in connection with this case, and passed the polygraph examination.[2]

### CONCLUSION

■ The Court will allow the Defendant to introduce the polygraph evidence for a limited purpose. The evidence will be admissible under the guidelines set forth by the Ninth

---

**2.** The Court does not reach the issue of whether polygraph evidence is generally admissible under Fed.R.Evid. 404. However, the Court notes that the polygraph evidence in the present case is solely admissible as impeachment or corroboration evidence. The polygraph evidence may be used to impeach or support credibility, it is not substantive evidence. Thus, given the limited purpose of the polygraph evidence in this case and the prejudicial effects of permitting this type of evidence to be used as substantive evidence, Rule 404 likely would not provide a basis for permitting the evidence to be introduced in the present case.

Circuit, the *Piccinonna* case, and this Court's order. The polygraph evidence will be admissible, subject to the following preliminary requirements.

First, the Defendant must provide sufficient notice to the government. Second, the opposing party must be given a reasonable opportunity to have its own competent examiner administer a polygraph examination which is materially similar to the previously taken examination. Third, the evidence will be admissible only to impeach or corroborate the testimony of the Defendant. Thus, pursuant to Rule 608(a), the polygrapher(s) and polygraphy experts may testify as to the Defendant's character for truthfulness, only if it has been impeached. The character witnesses may testify that the Defendant took the test in connection with this case and passed. The expert polygraphy witnesses may testify about polygraphy in general pursuant to Rule 702. Neither the experts, nor the character witnesses, may testify with respect to the specific questions asked, the specific responses, or specific physiological responses or data. In addition, if the Defendant testifies and the government impeaches by contradiction and impeaches his credibility, then the Defendant may support his credibility by stating he took a polygraph in connection with this case and passed the test.

In the present case, justice is best served by permitting the Defendant to introduce polygraph evidence in a limited fashion. The government will be permitted to administer a similar polygraph examination with its own expert. This Court's decision is clearly limited to the facts of this case. Defendant Crumby maintains his innocence and wishes to introduce scientific evidence to support this claim. Polygraph examinations are far more accurate in cases wherein the examination depicts a truthful subject than a deceptive subject. Thus, the accuracy rates in the present case are greater than those rates explored by most other courts. Finally, the Court has limited the potential prejudicial effects of the polygraph evidence by restricting the purposes for which it may be introduced. Polygraph evidence is scientific evidence which is probative of a subject's propensity for truthfulness with respect to a given set of circumstances. Accordingly, the Court concludes that under the specific facts of this case, the polygraph evidence will be admissible subject to the limitations set forth in this order.

Based on the foregoing,

**IT IS ORDERED,** granting in part and denying in part Defendant's motion to introduce the polygraph evidence.