**UNITED STATES, Appellant**

v.

**James L. WILLIAMS, Specialist
U.S. Army, Appellee.**

No. 94-5006.

CMR No. 9202646.

U.S. Court of Appeals for
the Armed Forces.

Argued March 30, 1995.*

Decided Sept. 29, 1995.

Certiorari Denied Feb. 20, 1996.

See 116 S.Ct. 925.

* Argued in the Grand Hall at the Association of the Bar of the City of New York. *See* 38 MJ 136,

For the Accused: *Captain Blair M. Jacobs* (argued); *Colonel Stephen D. Smith, Lieutenant Colonel James H. Weise, Major Fran W. Walterhouse, Captain Teresa L. Norris* (on brief); *Major Roy H. Hewitt* and *Captain Walter S. Weedman.*

For the United States: *Captain Anthony P. Nicastro* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel James L. Pohl, Captain Gregory T. Baldwin* (on brief); *Colonel John M. Smith* and *Major Kenneth T. Grant.*

*Amicus Curiae urging affirmance: George S. Sava* (law student) (argued); *Frank J. Macchiarola, Esq.* (on brief)—For the Benjamin N. Cardozo School of Law, Yeshiva University.

*Amicus Curiae urging reversal: Major Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise* (on brief); *Colonel Thomas E. Schlegal*—For Appellate Government Counsel, USAF.

*Opinion of the Court*

COX, Judge:

1. The certified issue in this case asks whether Mil.R.Evid. 707, Manual for Courts-Martial, United States, 1984 (Change 5) (1991), which purports to bar receipt at courts-martial of polygraph evidence, violates the accused's constitutional rights.

2. Mil.R.Evid. 707 provides:

(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence.

(b) Nothing in this section is intended to exclude from evidence statements made

137 n. 1 (CMA 1993).

during a polygraph examination which are otherwise admissible.[1]

3. In the instant case the accused sought, unsuccessfully, to introduce evidence of an allegedly exculpable polygraph. In the circumstances of this case, we hold that the accused's rights were not violated and that the military judge did not err in excluding the evidence.

## I

4. The accused was charged with forging checks between August 1991 and February 1992 (12 specifications), in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923, and a single specification of stealing the cumulative value of the negotiated checks—$8,077.89—in violation of Article 121, UCMJ, 10 USC § 921. He pleaded not guilty to all the forgery specifications. He also pleaded not guilty to the larceny specification, but, by exceptions and substitutions, he pleaded guilty to the lesser offense of wrongful appropriation, in the amount of $2,528.00.

5. Notwithstanding his pleas, however, a general court-martial composed of officer and enlisted members convicted the accused of all charges and specifications, as alleged. He was sentenced to a bad-conduct discharge, confinement for 3 years, total forfeitures, and reduction to E1. The convening authority approved the adjudged sentence.

6. The Court of Military Review[2], however, ordered the record of trial to be remanded for an additional hearing regarding admissibility of certain polygraph evidence. 39 MJ 555, 559 (1994). Thereupon, the Judge Advocate General of the Army certified the issue set out in ¶ 41 for this Court's review.

## II

7. The Court of Military Review summarized the facts as follows:

The [accused] was a Chaplains' Fund Clerk who, along with the Fund Manager, was in charge of collecting and disbursing funds for the chaplaincy within V Corps. During the period 18 August 1991—18 February 1992, a total of eighteen unauthorized disbursements were made from the fund account. The [accused] admitted to misappropriating three of these unauthorized disbursements in 1992, which he said that he intended to repay. He denied stealing the remainder.

In July 1992, the [accused] consented to taking a Criminal Investigation Command (CID) administered polygraph test. The test centered on whether the [accused] stole from the chaplains' fund between August and November of 1991. In the polygraph examiner's opinion, there was no deception indicated when the [accused] responded "no" to questions pertaining to the tested issue. The charts created by the polygraph instrumentation were then sent to the CID's quality control center in Maryland, which opined that the test results were inconclusive.

In August 1992, upon request by the [accused], he was retested by the same CID polygrapher. A more detailed pretest interview was conducted in order to focus the [accused] so that he would not be distracted, which could cause the test to be inconclusive. After this test, the examiner again opined that the [accused] was indicating no deception when he said that he did not steal money from the chaplains' fund between August and November 1991. Unlike the previous test, the examiner sent these polygraph charts to Heildelberg for review by his immediate supervisor, who

---

1. The drafters of the rules cite a variety of "policy grounds" for excluding polygraph evidence, including, allegedly: the "danger that court members will be misled by polygraph evidence" and the "danger of confusion of the issues"; the "substantial waste of time when the collateral issues regarding the reliability of the particular test and qualifications of the specific polygraph examiner must be litigated in every case"; the

"burden on the administration of justice that outweighs the probative value of the evidence"; and the assertion that "[t]he reliability of polygraph evidence has not been sufficiently established and its use at trial impinges on the integrity of the judicial system." Drafters' Analysis, Manual for Courts Martial, United States, 1984, at A22–46 (1994 ed.).

2. *See* 41 MJ 213, 229 n.* (1994).

was also an experienced CID polygrapher. The supervisor agreed with the findings and forwarded the charges to quality control in Maryland. This time, quality control opined that the test indicated no deception, and went on to say that the findings of the two examiners were "strong."

The [accused] filed a motion at his court-martial to be allowed an opportunity to lay a foundation for the admission of the two exculpatory CID polygraph examinations. The military judge denied the motion, finding Mil.R.Evid. 707 to be a proper exercise of executive rule-making authority under Article 36, UCMJ, 10 USC § 836, and violative of neither the Fifth nor Sixth Amendments of the Constitution. This ruling "impacted greatly" on [accused's] decision not to testify.

39 MJ at 556–57.

## III

8. The Government's evidence at trial consisted, in part, of the accused's sworn, written, signed pretrial statement. According to that statement, the interrogating agent asked, among other things:

> Did you, without proper authority, cash checks on the account of the Chaplains [sic] Fund, V Corps, with the intent of keeping the funds for yourself?

The accused responded: "Yes."

9. The accused also conceded therein that he fraudulently made and uttered three of the checks in issue, and he identified the uses to which he put the proceeds. The balance of the statement describes in some detail the mechanics of the accused's crimes and an acknowledgment that, on March 27, 1992, he

deposited $900 into the Fund. The accused explained that he "sent for the money from a relative, to deposit the money into the Chaplains [sic] Fund account." [3] The statement contains no recitation suggesting that, at the time he uttered the checks, the accused only intended temporarily to deprive the rightful owner of the proceeds.

10. Additional prosecution evidence, in the form of numerous records and documents and the testimony of various investigative, banking, and Chaplains' Fund officials, showed in detail how the accused manipulated the established procedures to both perpetrate his thefts and to mask their discovery. Still further evidence documented the flowage of the proceeds of the forged checks into the accused's personal bank account.

11. The defense case consisted, in part, of the testimony of the accused's wife, wherein she attempted to explain several of the anomalous credits to their bank account. The balance of the defense case on the merits consisted of a series of character witnesses.[4] Notably, the accused did not testify on the merits.

## IV

12. *United States v. Gipson,* 24 MJ 246 (CMA 1987), was a case in which we considered admissibility of polygraph evidence. Gipson proffered that he had secured, at his own expense, a polygraph examiner who had tested him and, as a result, was of the opinion that he was telling the truth when he denied committing various charged drug offenses. The prosecution countered that it, too, had a witness—a government polygra-

---

3. Presumably, the accused's argument that this deposit contradicted an intent permanently to deprive was undercut by evidence that he had previously been tipped off that his crimes had been detected. About a month before the accused's deposit, his supervisor "became suspect [sic] that there was some type of—something just wasn't right with the fund." The supervisor promptly notified higher authorities and, shortly thereafter, mentioned it to the accused.

4. Ironically, some of these character witnesses may have proven counterproductive for the defense. The accused's company commander, for example, extolled the accused for his administra-

tive and organizational abilities, his initiative, his being "computer literate," and his "unique ability to package things." According to the commander, "I give him a product to do, he just works magic." Considering the government evidence that the accused was able to perpetrate his offenses and avoid detection as long as he did due to a series of missing computer backup disks, missing and falsified documents, computers that had been "tampered with," and a rash of mysterious viruses causing the office computers to crash, the evidence of the accused's extraordinary intelligence and skills may have merely complimented the Government's evidence.

pher—who had tested Gipson and had reached the opposite conclusion. The military judge declined to permit either party to introduce polygraph evidence or even to attempt to lay a foundation for its admission. The judge concluded, *inter alia*, that such evidence had not met the requisite level of acceptance in the scientific community. 24 MJ at 247.

13. The issue squarely before us was whether the judge erred in applying the "general acceptance" test of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), or whether the relevance-helpfulness rules of Mil. R.Evid. 401–03 and 702 governed. As had several Federal Courts of Appeals before us (applying the corresponding Federal Rules of Evidence), we concluded that *Frye* was no longer the test to be applied to expert testimony. 24 MJ at 251. Passing no judgment on the ultimate admissibility of polygraph evidence in general or on that polygraph evidence in particular, we concluded merely that the military judge applied the wrong test and that he erred in denying Gipson the opportunity to attempt to lay a foundation for admission of his polygraph evidence.

14. Later, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court laid the *Frye* test to rest—in favor of the Rules of Evidence test—as the general test for receipt of expert testimony. *Id.* at 585, 113 S.Ct. at 2793. *See also United States v. Nimmer*, 43 MJ 252 (1995); *United States v. Youngberg*, 43 MJ 379 (1995).

15. However, the holdings of *Gipson* and *Daubert* do not, in this respect, govern the instant case. The *Daubert* opinion commenced with an analysis of Fed.R.Evid. 402, which provides:

All relevant evidence is admissible, *except as otherwise provided* by the Constitution of the United States, by Act of Congress, *by these rules*, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

(Emphasis added.)

16. There being no other Federal Rule of Evidence which precluded the particular type of evidence (epidemiological) offered in *Daubert* (509 U.S. at 584, 113 S.Ct. at 2792), the opinion proceeded to an analysis of Fed. R.Evid. 702, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

For the *Daubert* Court, then, resolution turned on the questions of relevance and helpfulness, with the focus being on the means by which the trial judge was to determine these factors. 509 U.S. at 591–95, 113 S.Ct. at 2796–98.

17. The *Gipson* opinion was decided in a similar environment, as Mil.R.Evid. 707 was not yet in effect. Thus, we had to construe Mil.R.Evid. 402, which provides:

All relevant evidence is admissible, *except as otherwise provided by* the Constitution of the United States as applied to members of the armed forces, the code, *these rules, this Manual,* or any Act of Congress applicable to members of the armed forces. Evidence which is not relevant is not admissible.

(Emphasis added.) We also merely had to consider the general rules respecting relevance and helpfulness of expert testimony.

18. The advent of Mil.R.Evid. 707, however, changed things for the military. Now, rather than the Military Rules of Evidence providing a framework for analysis of relevance and helpfulness, "these rules" expressly forbid receipt of the type of evidence here in issue. Thus *Daubert* and *Gipson*, being interpretations of very different rules, no longer control analysis of admissibility of polygraph evidence in courts-martial.

19. So also, the recent spate of Federal cases applying *Daubert* to polygraph evidence are not germane to our inquiry. *See United States v. Posado*, 57 F.3d 428, 429 (5th Cir.1995) ("the rationale underlying this circuit's per se rule against admitting polygraph evidence did not survive *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.* [*supra*]. Therefore, it will be necessary to reverse and remand to the district court for determination of the admissibility of the proffered evidence in light of the principles embodied in the Federal Rules of Evidence and the Supreme Court's decision in *Daubert* "); *United States v. Crumby*, 895 F.Supp. 1354 (D.Ariz. 1995) (improvements in accuracy of polygraph and *Daubert* permit defendant to introduce evidence that he passed polygraph to counter attacks on his credibility); *but cf. United States v. Lech*, 895 F.Supp. 582 (S.D.N.Y. 1995) (even assuming polygraph results are admissible under Fed.R.Evid. 702, questions calling for legal conclusions, but not underlying facts, would not assist factfinder).

## V

20. Instead, the focus becomes whether, and under what circumstances, the *per se* prohibition of polygraph evidence in courts-martial might violate service-members' constitutional rights. The Supreme Court has, from time to time, encountered situations in which bars to receipt of evidence have been imposed upon the criminally accused. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), for example, Washington sought, unsuccessfully, to call a coparticipant, Fuller, as a witness. Fuller allegedly would have testified that he, not Washington, was the triggerman in the murder. Texas statutes at the time of trial precluded coparticipants from testifying for one another, but not from testifying for the State. 388 U.S. at 16–17, 87 S.Ct. at 1921–22.

21. The Court concluded that Washington was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense. 388 U.S. at 23, 87 S.Ct. at 1925.

22. In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), a State "party witness" or "voucher" rule prevented Chambers from examining, as an adverse witness, a person (McDonald) who had previously confessed to committing the crime of which Chambers stood accused. Because the State had declined to call McDonald, Chambers was forced to make him his own witness. While the State, on cross-examination, was permitted to elicit McDonald's recantation of the confession, Chambers was barred from cross-examining him as an adverse witness. In addition, State hearsay rules precluded Chambers from introducing the testimony of three other persons to whom McDonald had also allegedly confessed.

23. Regarding the "voucher" rule, the Court observed:

> The argument that McDonald's testimony was not "adverse" to, or "against," Chambers is not convincing. The State's proof at trial excluded the theory that more than one person participated in the shooting of Liberty [the deceased police officer]. To the extent that McDonald's sworn confession tended to incriminate him, it tended also to exculpate Chambers. And, in the circumstances of this case, McDonald's retraction inculpated Chambers to the same extent that it exculpated McDonald. It can hardly be disputed that McDonald's testimony was in fact seriously adverse to Chambers. The availability of the right to confront and to cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State. We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word "against." The "voucher" rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges.

410 U.S. at 297–98, 93 S.Ct. at 1047 (footnote omitted).

24. Regarding the hearsay evidence, the State's declaration-against-interest exception

to the rule against hearsay encompassed declarations against pecuniary interest, but not declarations against penal interest. The Court noted that the statements in question "were originally made ... under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. at 1048. In addition, "McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." 410 U.S. at 301, 93 S.Ct. at 1049.

25. Concluding that Chambers' due process rights were violated, the Court commented:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

410 U.S. at 302, 93 S.Ct. at 1049 (citations omitted).

26. *See also Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (State law barring receipt in evidence of juvenile records and probation status of key prosecution witness violated Davis' right of confrontation by depriving him of opportunity to show witness had motive falsely to implicate Davis); *Crane v. Kentucky,* 476 U.S. 683, 687, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986) (established State rule that trial court's determination regarding voluntariness of pretrial confessions is conclusive and may not be relitigated at trial denied petitioner opportunity to attack accuracy of his purported confession and deprived him "of his fundamental constitutional right to a fair opportunity to present a defense"); *Rock v. Arkansas,* 483 U.S. 44, 58, 61–62, 107 S.Ct. 2704, 2712, 2714, 97 L.Ed.2d 37 (1987) (State's *per se* rule excluding all "hypnotically refreshed testimony" prevented Rock from showing that her memories might be reliable and potentially deprived her of the Fifth and Sixth Amendment right to be heard in her own defense).

## VI

27. Thus, in the appropriate case, the question will be whether the proffered polygraph evidence is sufficiently reliable and necessary that its automatic exclusion violates the accused's constitutional trial rights. We conclude, however, that this is not such an appropriate case, for reasons we now address.

28. The issue of admissibility of the instant polygraph evidence was resolved at trial on the basis of proffers by the parties. The polygrapher did not testify, and no documentation of the test questions or results was presented. Nevertheless, both parties agreed that the critical "relevant" questions at the polygraph examination focused on whether the accused stole money from the chaplains' fund. The accused responded, "No," to such questions. Thus it was the accused's denial of criminality that the polygrapher was prepared to opine was true (*i.e.,* that "no deception was indicated").[5]

---

5. Of course a polygrapher's opinion cannot possibly gauge the objective truth of any statement. At best they can opine that the subject *believed* the statement to be true. Thus, just as multiple witnesses to an event may take away different memories and interpretations of the same physical manifestation, in theory they could each pass a polygraph examination asserting their differing interpretations.

29. Having failed to take the stand and submit himself to the crucible of cross-examination, the accused argues that he should have been permitted nevertheless to introduce this out-of-court assertion, bolstered as it was with the expert's opinion that it was truthful. Of course this statement was made expressly with a view toward trial, after the alleged commission of the offenses; and, in light of the polygraphic support, it was unabashedly offered to prove the truth of the matter asserted. In other words, the proffered evidence was not just hearsay, but super-enriched hearsay.[6]

30. Allowing a party, in effect, to testify by proxy—without at the same time affording the opposition an opportunity to cross-examine or the factfinder an opportunity to observe and make its own evaluation of the party's credibility—would amount to nullification of the adversary system and a throwback to a bygone and little-missed era. *See 2 McCormick on Evidence* §§ 244–46 at 90–99 (4th ed.1992). The constitutional rights of an the accused are designed to assure a fair trial, not to subvert the adversary process.

31. That the expert's opinion cannot be separated from the underlying out-of-court declaration is self-evident, as the expert testimony clearly could not be offered simply to show that the accused made *some* truthful statement. Only when the opinion is connected with the underlying statement, explicitly or implicitly, can it have any arguable relevance to the case. We take it as obvious that when a party offers a polygrapher's opinion that a certain assertion did not indicate deception, the party is offering the evidence to prove that the assertion was true. A rose by any other name would smell as sweet.

32. The mere fact that the evidence was hearsay does not, alone, condemn it. However, unlike *Chambers v. Mississippi, supra* (¶ 22) (involving the accused's fundamental right to confront an adverse witness), this evidence was not presumptively reliable or closely akin to a recognized hearsay exception. Indeed, none of the cases in which the Supreme Court found evidentiary prohibitions objectionable involved efforts by an the accused to circumvent the adversary process by "smuggling" in his assertions, *in lieu* of testifying.[7] Had the accused testified, he might at least have argued that the truthfulness of his out-of-court statement was not offered to prove the truth of the matter asserted, but, instead, for the inference that his consistent *trial* testimony was true.

33. In *Gipson,* we addressed a similar concern. As we stated then:

Assuming a judge decides to admit the results of a given polygraph, how can they be used at trial? First and foremost, while polygraph evidence relates to the credibility of a certain statement, it does not relate to the declarant's character. At best, the expert can opine whether the examinee was being truthful or deceptive in making a particular assertion *at the time of the polygraph exam.* It is then for the factfinder to decide whether to draw an inference regarding the truthfulness of the exami-

---

6. The accused cannot capitalize on the vacuum arising from the fact that he obtained the unfavorable ruling *in limine* and then elected not to take the stand. In order to perfect his claim of right on appeal, it would have been necessary for him to testify or to establish some other valid evidentiary basis for admission of the hearsay evidence. *United States v. Gee,* 39 MJ 311 (CMA 1994); *see Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). At trial, the accused offered no hearsay exception justifying receipt of the evidence.

7. We recognize that, in some circumstances, it is possible under Fed.R.Evid. 703 and Mil.R.Evid. 703, Manual, *supra,* for a certain amount of hearsay evidence to be "smuggled" in as the basis for an expert's opinion. S. Saltzburg, L. Schinasi & D. Schlueter, *Military Rules of Evidence Manual* 739 (3d ed.1991); *see* S. Saltzburg, M. Martin & D. Capra, 2 *Federal Rules of Evidence Manual* 1134 (6th ed.1994). However, it is clear from the rule drafters' notes and the recorded decisions that such hearsay basis is permitted because it leads to some diagnosis or opinion other than that the hearsay itself was true. For example, a doctor might rely on a range of medical tests and reports, as well as statements of the victim or witnesses—not to show that the statements were true—but in order to reach a medical diagnosis. Rule 703 was never intended to become the electronic oath helpers' exception to the rule against hearsay. *Cf. 2 McCormick on Evidence* §§ 244–46 at 90–99 (4th ed.1992).

nee's *trial* testimony. *Cf. Commonwealth v. Vitello,* 376 Mass. 426, 381 N.E.2d 582, 597–98 (1978). Theoretically, it is conceivable that an expert's opinion about the truthfulness of a statement made during a polygraph exam could even support a direct inference as to guilt or innocence. However, we would not condone such opinion testimony absent the examinee's consistent testimony. If it were otherwise, the conclusions of the expert concerning the credibility of the declarant would be the only evidence presented to the factfinder. In this circumstance, we really would be concerned about usurpation of the factfinder's role.

24 MJ at 252–53 (footnotes omitted).

34. In concluding that the accused had no right to introduce the polygraph evidence without taking the stand and testifying consistently, or without offering some other plausible evidentiary basis, we recognize that we resolve little of the underlying question of the constitutionality of Mil.R.Evid. 707. Indeed, we do not even resolve whether the *per se* exclusion of this genre of evidence can be sufficient to implicate a constitutional right of an accused. That is to say, is this collateral-type evidence (an out-of-court, post-offense assertion of innocence by an accused, offered by the accused) of the same constitutional magnitude as those types of evidence that the Supreme Court has ruled constitutionally required? There are simply so many variables in the circumstances of individual cases that we deem it fruitless at this point to speculate generally in the absence of specific facts.[8]

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for further review.

Judge GIERKE concurs.

WISS, Judge (concurring with reservation):

35. I concur in the majority opinion except that, as to footnote 6, I expressly keep open for myself the question whether a non-testifying accused may preserve this issue for appellate review if he makes and loses a motion *in limine* to admit expert testimony concerning polygraphic evidence and then, through counsel—an officer of the court—forthrightly asserts that he would have testified had his motion been granted. *See United States v. Sutton,* 31 MJ 11 (CMA 1990).

CRAWFORD, Judge (concurring in part and in the result):

36. I agree with the majority's excellent discussion as to whether there is a constitutional right to introduce exculpatory polygraph evidence that would be paramount to any Military Rule of Evidence. However, since neither the Constitution nor the Uniform Code of Military Justice compels admission of exculpatory polygraph evidence, the majority could have stopped at that point. *United States v. Rodriguez,* 37 MJ 448, 453 (CMA 1993) (Crawford, J., concurring in the result).

37. In any event, since the accused did not take the witness stand, he did not preserve the certified issue for appeal. *United States v. Gee,* 39 MJ 311 (CMA 1994); *see also Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

38. However, I find curious that portion of the opinion that says "the proffered evidence was not just hearsay, but super-enriched hearsay." ¶ 29. The majority goes

---

**8.** Opinions from 41 MJ 213 to 43 MJ 389 have all included paragraph numbers as part of an experiment which the Court has been conducting to determine whether their use is feasible. We are now satisfied that putting paragraph numbers in our opinions presents no administrative burden. The Court was considering whether to require use in briefs of paragraph numbers instead of West internal page numbers for citation of quoted or referenced material found in an opinion. The citation would be to the first page of the opinion and paragraph number (42 MJ 340 ¶ 14), rather than to an internal page number (42 MJ 340, 343 or 42 MJ at 343). The Court has concluded that at this time it is not necessary to implement this change in the citation format. We would be interested in any comments on this proposal, including suggestions of alternative citation formats.

on to say, "[T]he expert's opinion cannot be separated from the underlying out-of-court declaration," ¶ 31, thus implying that there would be a hearsay objection to the expert's opinion. But as this Court stated in *United States v. Houser*, 36 MJ 392, 399, *cert. denied*, —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993):

> Under Mil.R.Evid. 703, like Fed.R.Evid. 703, an expert's opinion may be based upon personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial.

39. Fed.R.Evid. 703 was enacted to allow the expert to rely upon hearsay evidence, that is, evidence that would be relied upon to form an opinion, such as statements from other doctors, x-rays, business reports, and so forth. S. Saltzburg & M. Martin, *Federal Rules of Evidence Manual* 73 (5th ed.1990); *see also* J. Kaplan, J. Waltz, & R. Park, *Cases and Materials on Evidence* 764, 806 (7th ed.1992).

40. Therefore, it would seem to me that the accused's statements to a polygrapher are a valid basis for an otherwise relevant opinion. *See Barefoot v. Estelle*, 463 U.S. 880, 896–903, 103 S.Ct. 3383, 3396–3400, 77 L.Ed.2d 1090 (1983); *United States v. Prevatte*, 40 MJ 396, 397 (CMA 1994); *United States v. Johnson*, 35 MJ 17 (CMA 1992); *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994). However, since I believe this case can be decided on other grounds, the question of whether the majority's view on hearsay is correct can wait for another day.

SULLIVAN, Chief Judge (concurring in the result):

41. I agree with much of the majority opinion but conclude it does not go far enough to directly answer the certified issue, which asks:

WHETHER MILITARY RULE OF EVIDENCE 707 VIOLATES THE ACCUSED'S FIFTH AMENDMENT RIGHT TO A FAIR TRIAL OR HIS SIXTH AMENDMENT RIGHT TO PRODUCE FAVORABLE WITNESSES.

42. Initially, I would hold that the Fifth and Sixth Amendments of our Constitution do apply to the military. As the venerable Blackstone intimated long ago, I believe that a soldier who serves his country does not forgo his rights as a citizen. Blackstone, *Commentaries on the Laws of England* Bookfirst, Chapter 13 at 395 (1765). Furthermore, I would hold that due process and the right to a fair trial require admission of relevant and reliable evidence as long as it applies to the crime, the witnesses, and the legal defenses to the crime. The Constitution, however, does not require admission of machine-generated evidence that only shows whether the defendant believes that his claim of innocence is truthful. Modern courts have consistently prevented admission of evidence of truth-telling, and I would do so in this case.

43. The evidence sought to be introduced at this trial was the polygraph result of "no deception" when the accused was asked whether he "stole from the Chaplain's fund between August and November of 1991." *See* 39 MJ 555, 556 (ACMR 1994). In my view, the judge properly ruled this evidence inadmissible.

44. First, when evidence of polygraph tests results is offered at trial to support the credibility of an accused's pretrial statement denying an offense, its admission also raises serious questions under Mil.R.Evid. 608, Manual for Courts–Martial, United States, 1984. *See generally United States v. Azure*, 801 F.2d 336, 341 (8th Cir.1986). That Rule states:

> **Rule 608. Evidence of character, conduct, and bias of witness**
>
> (a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Applying this rule, we have barred testimony from psychiatric and psychological experts that child-abuse victims are telling the truth

in their pretrial complaints. *United States v. Marrie,* 43 MJ 35, 41 (1995); *United States v. Suarez,* 35 MJ 374, 376 (CMA 1992); *United States v. Arruza,* 26 MJ 234, 237 (CMA 1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). The same logic should be extended to a mechanical oath swearer or compurgator.

45. I would also note that admissibility of such evidence for this purpose infringes on the jury's role in determining credibility. *See United States v. Alexander,* 526 F.2d 161, 168–69 (8th Cir.1975). The Ninth Circuit commented on this problem in *Brown v. Darcy,* 783 F.2d 1389, 1396–97 (1986), as follows:

The introduction of polygraph evidence also infringes on the jury's role in determining credibility. Our adversary system is built on the premise that the jury reviews the testimony and determines which version of events it believes. Allowing a polygraph expert to analyze responses to a series of questions and then testify that one side is telling the truth interferes with this function. *See Alexander* 526 F.2d at 168; *see also Dowd,* 585 F.Supp. at 434. Polygraph evidence is different from other scientific evidence such as ballistics, fingerprints, or voice analysis, because it is an opinion regarding the ultimate issue before the jury, not just one issue in dispute. *Alexander,* 526 F.2d at 169. Providing the jury with an all or nothing evaluation of credibility and then telling the jury that this evaluation has an eighty percent to ninety percent chance of being accurate if the polygraph was properly administered interferes with, rather than enhances, the deliberative process.

These concerns are not addressed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Mil.R.Evid. 702. In my view, Mil.R.Evid. 707 addresses them and properly so.